[No. S004608. Crim. No. 23538. Feb. 23, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDREW EDWARD ROBERTSON, Defendant and Appellant.

**COUNSEL**

Timothy J. Foley and Gail R. Weinheimer, under appointments by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Frederick R. Millar, Jr., Rudolf Corona, Jr., John W. Carney and Maxine P. Cutler, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**PANELLI, J.**—This is an automatic appeal from a judgment of death (Cal. Const., art. VI, § 11; Pen. Code, § 1239, subd. (b)) imposed under the 1977 death penalty law (former Pen. Code, §§ 190-190.6, Stats. 1977, ch. 316, §§ 4-14, pp. 1256-1262, repealed by Prop. 7, Gen. Elec. (Nov. 7, 1978))[1] following retrial of the issue of penalty after an initial judgment of death was reversed in *People* v. *Robertson* (1982) 33 Cal.3d 21 [188 Cal.Rptr. 77, 655 P.2d 279] (hereinafter *Robertson I*).

After trial a jury found defendant Andrew Edward Robertson guilty of two first degree murders and found true nine charged special circumstances.[2] The jury fixed the penalty at death; the court entered judgment in accordance with the jury's verdicts and findings. On appeal we affirmed the judgment of guilt and the special circumstance findings, but reversed the judgment as to penalty. (*Robertson I, supra,* 33 Cal.3d at p. 60.)

After retrial to the bench, the court fixed the penalty at death and entered judgment accordingly. This appeal followed.

As will appear, we affirm the judgment.

### I. Facts

Pursuant to a waiver of jury trial by the prosecution and the defense, retrial of the penalty phase was before the court as trier of fact. The judge on retrial was not the judge who had presided over the initial trial.

Before the court by stipulation of the parties were transcripts of prior testimony in this action. In the words we used in *Robertson I, supra,* 33 Cal.3d 21, the prior testimony told the following tale.

"This case arises out of the deaths of two women, Karen Ann Litzau and Kimberly Gloe, in October 1977. Shortly after his arrest, defendant gave a detailed, tape-recorded confession to both homicides, and then reenacted the killings on film at the scenes of the crimes. The tape-recorded and filmed confessions were admitted at trial. Complemented by additional evidence presented by the prosecution, the record discloses the following facts.

---

[1] Except as otherwise indicated, all statutory references are to the Penal Code.

[2] The jury found true the special circumstance allegations of multiple first degree murders (former § 190.2, subd. (c)(5)), both of which were wilful, premeditated and deliberate and were committed during the commission or attempted commission of robbery (former § 190.2, subd. (c)(3)(i)), kidnap (former § 190.2, subd. (c)(3)(ii)), and rape (former § 190.2, subd. (c)(3)(iii)), and involved the infliction of torture (former § 190.2, subd. (c)(4)).

"In the early morning hours—2 or 3 a.m.—of October 20, 1977, defendant stopped and picked up Karen Litzau as she was hitchhiking on a freeway on-ramp in San Bernardino. At first defendant only intended to give Litzau a ride but then, as the two were driving, decided to have sexual relations with her. When she refused, he put his right arm around her neck, pressed a knife to her throat and told her they were going to have intercourse.

"After leaving the freeway and driving to a secluded area on a dirt road, defendant stopped the car. When Litzau began to call him names—'crazy, a son of a bitch, an asshole, everything in the book'—defendant began ripping off her clothes. Litzau asked defendant if he was going to kill her and he said 'no.'

"Defendant then placed Litzau on the hood of his car, intending to have intercourse. When she started calling him names again, however, he 'yanked her off the car and started stabbing her.'

"At one point in his confessions, defendant stated that he only remembered stabbing Litzau twice and that '[m]y mind went blank. The next thing I knew I was on the freeway and I had blood on my hands.' Immediately thereafter, however, defendant described the incident in considerable detail, recalling that he had cut Litzau's throat and stomach and had stabbed her repeatedly in the heart, back and vagina. In the course of his confession, defendant also admitted that at one point during the stabbing he stopped momentarily, thinking Litzau was dead, but when he discovered that she was still alive, he cut her throat.

"Before leaving the scene, defendant tried to cut off a breast of Litzau's lifeless body but failed because his knife was too dull. He took several pairs of panties, a cosmetic case and an engraved cigarette lighter from her suitcase, urinated on the body and drove away. At different points in his confession defendant stated alternatively that he decided to kill Litzau when she 'call[ed] [me] names' and 'when she started saying that she was going to tell on me.'

"Litzau's body was found the next morning. An autopsy revealed more than 170 knife wounds over her entire body.

"One night about a week and a half later, defendant picked up Kimberly Gloe as she was offering her services as a prostitute on a street in San Bernardino. After she entered the car, defendant pulled a knife and drove to a secluded area. He had brought his knife because he wanted sex. When

Gloe told him that force was not necessary, he put the knife away. He stopped the car and they engaged in various sex acts.

"Thereafter, Gloe told defendant that she 'had a guy rape me before and I squealed on him, but they couldn't find him, and I might squeal on you, too.' When defendant said 'You wouldn't do that, would you?' she responded, 'Yeah, I would.' Gloe then got out of the car to get her clothes and clean herself off.

"Defendant grabbed his knife, followed her out of the car and started stabbing her in the stomach. He remembered stabbing all over her body, cutting her throat and stomach, removing her intestines, cutting off her breasts,[3] and stabbing her in the vagina, leaving his knife embedded there. He stated that he stabbed her in the vagina because 'I wanted to do it the same way I did Karen.' A subsequent autopsy revealed 120 separate stab and incisional wounds.

"After Gloe was dead, defendant attempted to break her legs '[b]y standing and pulling on them and then again urinated on the body. He left with her address book and her bra and panties. Asked if he had intended to kill Gloe when he first picked her up, defendant stated that 'I didn't have any intention of killing her until she started saying she was going to snitch on me. . . .'

"A few days after Gloe's death, a woman who had seen Gloe get into defendant's car spotted the car parked in a gas station and notified the police, who traced the car to defendant and arrested him. At the time of his arrest, Litzau's cigarette lighter was found in his pocket. With defendant's consent, the officers searched his apartment and found Gloe's address book, Litzau's cosmetic case and—under his bed—numerous items of women's underwear, including several belonging to each of the victims." (*Robertson I, supra,* 33 Cal.3d at pp. 31-32.)

In its case-in-chief, the prosecution set out to show the penalty of death was appropriate for defendant. At the penalty phase of the initial trial the defense had attempted to demonstrate that defendant's culpability was reduced by mental disease or defect. In evident anticipation of the case it expected the defense to present here, the prosecution called several expert witnesses.

The prosecution experts—four psychiatrists and two psychologists—testified in sum as follows: defendant had a character or personality disorder,

---

[3] At this point the *Robertson I* opinion notes: "Defendant had sharpened his knife between the Litzau and Gloe homicides." (33 Cal.3d at p. 32, fn. 2.)

variously described as passive-aggressive or mixed character disorder with antisocial features and poor impulse control; he was emotionally immature and was of borderline or low average intelligence; he lacked insight and was concerned only for himself; he was sexually aggressive, received gratification from inflicting pain and had feelings of inadequacy; and as a child he had developed slowly and suffered emotional trauma. The prosecution experts were in conflict as to whether defendant was a mentally disordered sex offender; they were unanimous that defendant did not suffer from any mental disease or defect and was not affected by posttraumatic stress disorder.

As further evidence in aggravation of penalty, the prosecution introduced evidence of defendant's prior crimes. Ernest F. testified that one night in 1973, when he was a 19-year-old enlisted man in the Marine Corps, he went out drinking in Yuma, Arizona; at a bar he met a man who introduced himself as "Tex"; he and "Tex" went bar hopping; in the desert outside of Yuma, "Tex" attacked him, placing a knife to his neck and jabbing him with the weapon; "Tex" forced him to submit to oral copulation as he held the knife at his testicles and groin and jabbed; "Tex" repeatedly threatened to mutilate him and leave him in the desert and also threatened to kill him; he offered no resistance to the attack and soon managed to escape; he reported the incident to the police, but charges were never filed. At trial he stated defendant was the man he had known as "Tex."

Kim P. testified that one night in 1976 she was standing in a parking lot at a truck stop in Ontario, California; a man approached her from behind, put a knife to her throat and forced her into his automobile; a citizen's band radio was on; he drove her to a remote area where he compelled her to disrobe and then cut off her underpants with his knife; he told her he hated women and repeatedly said he was going to kill her; he beat her about the face, head, and breasts; he violated her with a Coca-Cola bottle until her vagina bled; he put lit cigarettes into her vagina and called her a "cry baby" when she complained of pain; he forced her to orally copulate him; he took a pair of underpants from her bag, saying they were for a collection he kept; when the citizen's band radio crackled, he became distracted and she fled; he cruised around the area for five or ten minutes shouting threats that he would kill her, but she made good her escape and reported the incident to the police. She identified defendant as her assailant.

Finally, Catherine A. testified that one night in 1977 a man driving a station wagon approached her as she was walking along a street in San Bernardino; he offered to pay her for sexual services; she accepted and entered the vehicle; the man pulled a gun and said, "All right, you fucking whore bitch. I've got you now," and drove on; when they arrived at a

remote area, the man told her to get in the back of the station wagon and remove her clothing; he repeatedly said he had to kill her; when she asked why, he responded otherwise she would go to the police; she replied she would not and generally attempted to mollify him; he sodomized her until she bled, forced her to orally copulate him and masturbated in her face; he beat her breasts and regarded them with obsession; he took her underpants, saying he wanted them for a collection he kept; eventually, he told her to get out of the car; when she did so, he began to drive off, but then turned the car back; as she hid in a nearby cemetery, he drove up and down for about 20 minutes and eventually left; she did not report the incident at that time and charges were never filed. At trial, she identified defendant as her assailant.

In its case-in-chief, the defense endeavored to show death was not the appropriate penalty: defendant had a traumatic childhood, was mildly mentally retarded, had low intelligence and poor judgment, and was in essence a 12-year-old boy in the body of a man; at the time of the crimes he was affected by posttraumatic stress disorder as a result of military service in Vietnam and by brief reactive psychosis; he had made an excellent adjustment to incarceration, had become sincerely religious, and would behave well in prison and pose no danger to others.

To support its position, the defense introduced evidence, through defendant's mother and sister and expert witnesses, concerning defendant's life before commission of the crimes in question. The evidence shows a traumatic birth preceded by a difficult and prolonged labor; slow development of speech and walking; parental divorce, followed by kidnap by his father, ultimate return to his mother, and thereafter care alternating between a disturbed mother and a strict grandmother; domination by a cruel and overbearing sister; and social and academic difficulty in school. At nine years of age, defendant was examined by a neurologist, who diagnosed him as mildly mentally retarded with possible brain damage.

Defendant served two years in the Job Corps and then enlisted in the Army. During his eight years military service he did two tours of duty in Vietnam, totaling almost three years. On his return to the United States, defendant had difficulty adjusting to the less structured environment of the peacetime military; he experienced nightmares and suffered from depression. In 1973 he married a woman 12 years his senior who had 4 children by a previous marriage. The union quickly ended in divorce, as defendant was unable to shoulder responsibility and was closer in mental and emotional level to the children than to his wife.

In 1975 defendant attempted to reenlist in the Army, but was refused. Thirty years old, he returned to his mother's home. He was unable to learn

a usable skill or to hold a job. In 1976 he attacked Kim P. and was sent to jail. In 1977 he was released. Later that year he killed Karen Ann Litzau and Kimberly Gloe.

Dr. Hunt, the neurologist who had examined defendant at age nine, testified defendant had suffered organic brain damage and was mildly mentally retarded and not amenable to treatment; he appeared to suffer from no specific mental disease, nor was there any plain psychiatric explanation for his behavior, although he may have been psychotic during commission of the crimes in question. Dr. Hunt believed defendant had suffered definite impairment of his mental functions and therefore should not be sentenced to death.

Dr. Robert Postman, a psychologist, testified defendant was of below average intelligence, was probably mildly mentally retarded and perhaps had an antisocial personality disorder; at the time of the crimes in question he was suffering from brief reactive psychosis rooted in part in a deep hatred of women. Dr. Postman believed defendant would pose no danger to others in the structured setting of prison and would be productive there.

Thomas S. Wulbrecht, director of the Vietnam Veterans Outreach Center in Riverside, testified about defendant's experiences in Vietnam and their effects on his psyche. Wulbrecht stated defendant exhibited chronic posttraumatic stress disorder overlaid with an antisocial personality disorder; posttraumatic stress disorder could lead to a dissociative state wherein the subject would revert to the "survivor mode" of combat in an "altered state of consciousness"; the commission of the crimes in question was consistent with behavior in such a state; it was also consistent with behavior under brief reactive psychosis.

As evidence defendant would not pose a danger to others if he were sentenced to life imprisonment without possibility of parole, the defense presented the testimony of three correctional officers and two fellow inmates of defendant.

Deputy Sheriff Roger Coyle testified that during defendant's confinement in the county rehabilitation center he conducted himself well and never caused any disciplinary problems; on one occasion when Deputy Coyle was attacked by other inmates and lost control of his gun, at danger to himself defendant pushed the other inmates against a wall to prevent their obtaining the gun.

Sergeant Gerald Riley, formerly a correctional officer on "Death Row" at San Quentin Prison, testified defendant adapted readily to incarceration and

was "an outstanding prisoner" and had "never been any problem"; he gets along with everybody well; he follows the rules; he seems to have the intelligence of a fourth- or fifth-grader; he is a hard worker and eagerly does favors for the staff and other inmates; although when he arrived on Death Row, he had an obsessive interest in pornography, he has since started studying the Bible and become a born-again Christian; as a result, he has put away pornography and become an even better prisoner than he had previously been. Sergeant Riley believed defendant would pose no danger to others in prison. Norvell Greene, a correctional officer on Death Row, gave similar testimony.

Mariney Joseph and William Payton, death row inmates with defendant, testified to their Bible study with defendant and the marked change it had produced in him.

Following closing argument, the court announced its penalty decision. Thereafter, the court denied defendant's automatic motion for modification of penalty (former § 190.4, subd. (e)) and imposed judgment of death.

## II. CONTENTIONS

Defendant makes several claims attacking the judgment of death. As will appear, none requires reversal.

A. *The Court's Jurisdiction to Decide Penalty.*

■ Defendant contends that under the 1977 death penalty law the court was without jurisdiction to decide the issue of penalty when, as here, a jury had decided the issue of guilt.

Except as provided otherwise by statute, "Superior courts have original [subject matter] jurisdiction in all causes," criminal as well as civil. (Cal. Const., art. VI, § 10.) "Inherent in subject matter jurisdiction is the power to inquire into the facts, to apply the law and to declare the punishment." (*Burris* v. *Superior Court* (1974) 43 Cal.App.3d 530, 537 [117 Cal.Rptr. 898]; accord, *People* v. *Brown* (1970) 10 Cal.App.3d 169, 175 [88 Cal.Rptr. 801], citing authorities.) We find nothing in the 1977 death penalty law that denies the court power to decide the issue of penalty in a case in which a jury has decided the issue of guilt.

In arguing to the contrary defendant relies on former section 190.4, which provided in relevant part as follows.

"(b) If defendant was convicted by the court sitting without a jury, the trier of fact at the penalty hearing shall be a jury unless a jury is waived by

the defendant and the people, in which case the trier of fact shall be the court. If the defendant was convicted by a plea of guilty, the trier of fact shall be a jury unless a jury is waived by the defendant and the people.

 ". . . . . . . . . . . . . . . . . . .

"(c) If the trier of fact which convicted the defendant of a crime for which he may be subjected to the death penalty was a jury, the same jury shall consider any plea of not guilty by reason of insanity pursuant to [Penal Code] Section 1026, the truth of any special circumstances which may be alleged, and the penalty to be applied, unless for good cause shown the court discharges that jury in which case a new jury shall be drawn. The court shall state facts in support of the finding of good cause upon the record and cause them to be entered into the minutes." (Stats. 1977, ch. 316, § 12, p. 1261.)

We do not read the foregoing provisions to deny the court jurisdiction to decide the issue of penalty when a jury has decided the issue of guilt. Subdivision (b) was evidently intended to grant defendants who had waived jury trial on the issue of guilt the right to a penalty determination by a jury. Subdivision (c), in turn, was evidently intended to provide that when guilt had been determined by a jury, the *same* jury should decide the remaining issues unless discharged for good cause, i.e., to declare that defendants who had been convicted by a jury were not entitled to have a different jury determine the issues of special circumstance, sanity, or penalty. Whether read separately or together, these provisions patently do not affect the subject matter jurisdiction of the court. Consequently, the court had jurisdiction to determine the issue of penalty in defendant's case.

B. *Waiver of Trial by Jury.*

■■■ Defendant contends his waiver of trial by jury on the issue of penalty was invalid. He maintains the court's failure to inform him of the effect of jury deadlock under the 1977 death penalty law and its asserted misleading advice concerning the need for jury unanimity precluded him from making an intelligent and understanding waiver. (E.g., *Carnley* v. *Cochran* (1961) 369 U.S. 506, 516 [8 L.Ed.2d 70, 82 S.Ct. 884]; *In re Tahl* (1969) 1 Cal.3d 122, 131, 133 [81 Cal.Rptr. 577, 460 P.2d 449].)

Concerning jury deadlock, former section 190.4, subdivision (b) provided: "If the trier of fact is a jury and has been unable to reach a unanimous verdict as to what the penalty shall be, the court shall dismiss the jury and impose a punishment of confinement in state prison for life without possibility of parole." In advising defendant of his right to a penalty jury and the

implications of a waiver, the court made no reference to the effect of a jury deadlock, but stated: "You understand, also, that if you do waive jury and submit it to the Court, the Court will act solely. *If you have a jury trial, before a verdict can be returned either way, it requires unanimous agreement of all 12 jurors*; do you understand that?" (Italics added.) Defendant concedes the court's statement was technically correct, but argues that in omitting the consequences of a deadlock it was prejudicially misleading.

██ It is settled a defendant does not have a constitutional right to jury trial on penalty. (*Spaziano* v. *Florida* (1984) 468 U.S. 447, 458-459 [82 L.Ed.2d 340, 104 S.Ct. 3154] [federal Constitution]; *People* v. *Hough* (1945) 26 Cal.2d 618, 620-621 [160 P.2d 549] [state Constitution].) In *Hicks* v. *Oklahoma* (1980) 447 U.S. 343 [65 L.Ed.2d 175, 100 S.Ct. 2227], however, the United States Supreme Court stated: "Where"—as in California—"a State has provided for the imposition of criminal punishment in the discretion of the trial jury, . . . [t]he defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion [citation], and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State." (447 U.S. at p. 346 [65 L.Ed.2d at p. 180].)

██ In the instant case, having reviewed the question closely, we are of the opinion there was no such arbitrary deprivation. Rather, the record reveals a knowing, intelligent and voluntary waiver by defendant of his statutory right to trial by jury on the issue of penalty. Defendant was represented by two apparently competent counsel who over the course of several days discussed with him "at length" the consequences and nature of his proposed waiver. Absent an assertion or evidence to the contrary, we presume that competent counsel would have informed defendant of the effect of a jury deadlock. (Cf. *People* v. *Hendricks* (1987) 43 Cal.3d 584, 592-593 [238 Cal.Rptr. 66, 737 P.2d 1350].) Counsel in defendant's presence expressed on the record their sound tactical reasons for advising defendant to waive a jury and consenting to the waiver.[4] The court, before

---

[4] Counsel explained: "Number one. It is a tactical decision on our part based upon conversations that counsel, Mr. Wolfe and I have had with friends, people in the community, other attorneys, competent trial criminal law attorneys in the area. After a complete review of the facts of the individual case, and, lastly, based upon conversations with a Dr. Linda Mesa, an expert psychologist on jury selection in death penalty cases, based upon those reasons, and in talking to Mr. Robertson, we feel it is to his advantage and the best advise [*sic*] that he, in fact, give up his right to have a jury trial on this issue, and instead consent to have the matter heard as a court trial.

"I would also indicate to the Court that we have explained to Mr. Robertson, and he realizes that this does not mean that he would gain a favorable advantage by waiving the jury, because as he well knows the Court is limited to making a decision of either imposing the death

accepting defendant's waiver, engaged him in an extensive and thorough voir dire expressly directed to determining his waiver was knowing, intelligent and voluntary.[5] Although the court would have done better to explain

penalty or imposing the punishment of life without possibility of parole. By him waiving the jury does not, and he realizes this, gain an advantage as to one of those punishments as against the other punishment."

[5] The relevant colloquy was as follows: "THE COURT: Mr. Robertson, under the law you do have a right to waive your right to jury. Of course, the District Attorney has a right to a jury trial, too. Before the Court can accept it, it will require a waiver from the District Attorney's office, also. Under the law the Court, although you have the right to do that, the Court is required to make inquiry of you to be sure that it is a knowing and intelligent waiver before the Court can consent to it. So, I am going to go through some questions which have been provided to me by the District Attorney as a condition of their consenting to waive the jury, also, and I want to discuss this with you very briefly.

"You understand that your position of dire or severe jeopardy in the rehearing of your trial's penalty phase will not be reduced by the fact you are choosing a court trial rather than a jury trial; do you understand that?

"THE DEFENDANT: Yes, sir.

"THE COURT: You also understand that you should be aware that you are in exactly the same jeopardy regardless of the method of trial which you personally will choose? Your position will not be altered in any degree. Neither the evidence nor the legally appropriate outcome dictated by the evidence will be altered, only the avenue of your alternate sentencing will be changed in any way; do you understand that?

"THE DEFENDANT: Yes, sir.

"THE COURT: You understand, also, that if you do waive jury and submit it to the Court, the Court will act solely. If you have a jury trial, before a verdict can be returned either way, it requires unanimous agreement of all 12 jurors; do you understand that?

"THE DEFENDANT: Yes, Your Honor.

"THE COURT: And understanding that you still wish to waive and give up your right to have a jury?

"THE DEFENDANT: Yes, sir.

"THE COURT: You understand that my personal philosophy, if any, concerning [the] death penalty will not affect or interfere with my evaluation of the evidence or application of the law; do you understand that?

"THE DEFENDANT: Yes, sir.

"THE COURT: Under my constitutional oath I'm required to apply the law the way it is whether I personally agree with it or not. My personal philosophy has nothing to do with it. Do you understand that?

"THE DEFENDANT: Yes, sir.

"THE COURT: In other words, you, by waiving your right to a jury trial, are doing so with the awareness that the Court will behave as a jury, a jury that has sworn that it will sentence you to death if appropriate under the law and the evidence; do you understand that?

"THE DEFENDANT: Yes, sir.

"THE COURT: And the other side of that, of course, is that the Court will sentence you to life in prison without the possibility of parole if the Court finds, after reviewing all the evidence, that that is appropriate under the law and the evidence; you understand that, also?

"THE DEFENDANT: Yes, sir.

"THE COURT: You understand that by waiving your right to a jury trial on the issue of your penalty and by requesting a court trial you are not lessening, reducing or eliminating the possibility of your penalty being set at death if the evidence supports such a penalty; do you understand that?

"THE DEFENDANT: Yes, sir.

to defendant the effect of a jury deadlock, its omission does not invalidate defendant's waiver. Defendant's requirements for an effective waiver are too stringent for any situation; no waiver requires the court to explain every single conceivable benefit and burden of the choice being made.[6]

Nor, as defendant argues, does the court's failure to inform him that it would automatically review any verdict of death returned by a jury, require a different conclusion. We have previously held that a failure to so advise a defendant under the 1978 death penalty law does not vitiate a jury waiver. (*People* v. *Deere* (1985) 41 Cal.3d 353, 359 [222 Cal.Rptr. 13, 710 P.2d 925].) The same is true under the 1977 statute.

Finally, we reject defendant's claim the court failed to conduct the hearing on his jury waiver with the "special attention and care" that he asserts his allegedly "borderline intelligence" merited. The record is otherwise.

## C. *Boykin-Tahl Waiver.*

Following defendant's waiver of jury trial, counsel stipulated the court could read and consider the former testimony of 21 specified witnesses, with the understanding either side could if it wished call any of the witnesses for

"THE COURT: You understand that by waiving your right to jury trial you are not receiving any promises from anyone, either express or implied, of leniency or special consideration; do you understand that?

"THE DEFENDANT: Yes, sir.

"THE COURT: Having been made aware of the Court's legal obligations and the Court's planned course of conduct required by the law, is it your desire to give up your right to a jury trial on the issue of your penalty and request a court trial?

"THE DEFENDANT: Yes, sir.

"THE COURT: In making your decision to waive your rights to a jury trial, has anyone made any direct or implied threats to you?

"THE DEFENDANT: No, sir.

"THE COURT: Or has anybody made any direct or implied promises to you?

"THE DEFENDANT: No, sir.

"THE COURT: In making your decision to waive your right to a jury trial, do you believe that you have received any kind of pressure from anyone?

"THE DEFENDANT: No, sir.

"THE COURT: Is your decision to waive your right to a jury trial freely and voluntarily made?

"THE DEFENDANT: Yes, sir.

"THE COURT: And do you have any questions concerning your waiver?

"THE DEFENDANT: No, sir.

"THE COURT: I take it counsel again join with the defendant in the waiver?

"MR. WELCH: Counsel joins, yes, Your Honor.

[6] We recognize that *Harris* v. *State* (1983) 295 Md. 329 [455 A.2d 979, 984-985], supports defendant's argument that his waiver was ineffective. However, we find its reasoning unpersuasive and decline to follow it here. (See 455 A.2d at pp. 985-986 (conc. & dis. opn. of Murphy, C. J.).)

additional testimony. Defendant assented to the stipulation. The prior testimony dealt with the circumstances of the crimes and the background to defendant's statements to the police and was given at defendant's preliminary hearing, the special hearing on the admissibility of his confession, and his first trial. The parties called 3 of the 21 witnesses whose prior testimony was submitted, as well as 20 additional witnesses.

Citing *Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709], *In re Tahl, supra,* 1 Cal.3d 122 and their progeny, defendant claims the court erred in failing to advise him and obtain on-the-record waivers of his constitutional rights to a jury trial, to confrontation and cross-examination and against compulsory self-incrimination.

Under the rule of *Boykin* v. *Alabama, supra,* 395 U.S. 238, and *In re Tahl, supra,* 1 Cal.3d 122, as extended in *Bunnell* v. *Superior Court* (1975) 13 Cal.3d 592 [119 Cal.Rptr. 302, 531 P.2d 1086] and other cases, "when the defendant agrees to a submission procedure, such as a guilty plea or a submission on the preliminary hearing transcript, by virtue of which he surrenders one or more of the three specified rights [jury trial, confrontation and privilege against self-incrimination]" (*People* v. *Hendricks, supra,* 43 Cal.3d at p. 592), the record must reflect that he was advised of and personally waived the applicable right or rights. (*Bunnell, supra,* at p. 605.) When the submission is a guilty plea or "tantamount to a plea of guilty" (*In re Mosley* (1970) 1 Cal.3d 913, 924 [83 Cal.Rptr. 809, 464 P.2d 473]) the *Boykin-Tahl* requirements are constitutionally compelled. (*Id.* at p. 926, fn. 10; see *People* v. *Levey* (1973) 8 Cal.3d 648, 652 [105 Cal.Rptr. 516, 504 P.2d 452].) When, however, the submission is in fact not tantamount to a guilty plea—when "it appears on the whole that the defendant advanced a substantial defense" (*People* v. *Wright* (1987) 43 Cal.3d 487, 497 [233 Cal.Rptr. 69, 729 P.2d 260])—the *Boykin-Tahl* advisements and waivers are not constitutionally compelled, but are required only as a matter of judicial policy. (*Ibid.*; see *People* v. *Hendricks, supra,* 43 Cal.3d at p. 592; cf. *People* v. *Gray* (1982) 135 Cal.App.3d 859, 869 [185 Cal.Rptr. 772] [hybrid proceeding].)

We have not previously had occasion to determine whether the *Boykin-Tahl* rule applies at the penalty phase of a capital case, nor has the United States Supreme Court addressed the application of *Boykin* to penalty trials. Assuming, without deciding, that the requirements of *Boykin-Tahl* would in some circumstances apply to a submission of the issue of penalty on the transcript of prior proceedings, this is not such a case.

A "submission" within the meaning of *Tahl, supra,* 1 Cal.3d 122 and *Bunnell, supra,* 13 Cal.3d 592 occurs when a defendant gives up his

right to trial by jury and, unless otherwise specified, the right to present additional evidence in his own defense and agrees the court can decide his case on the basis of the transcript of prior proceedings. (*Bunnell* v. *Superior Court, supra,* 13 Cal.3d at p. 604; see *People* v. *Hendricks, supra,* 43 Cal.3d at p. 593.) Although the parties may reserve the right to present additional evidence, the essential components of a submission are waiver of a jury trial and, with respect to the witnesses who testified in the prior proceedings, waiver of the right to confrontation in the present proceeding. (See *People* v. *Wright, supra,* 43 Cal.3d at p. 496; *People* v. *Hendricks, supra,* 43 Cal.3d at p. 593, and cases cited; cf. *People* v. *Phillips* (1985) 172 Cal.App.3d 670 [218 Cal.Rptr. 524].) When the submission is a "slow plea" or "tantamount to a plea of guilty," the defendant also gives up his privilege against self-incrimination. (*People* v. *Levey, supra,* 8 Cal.3d at p. 652.) Thus, a "submission" is defined by the rights a defendant surrenders.

 Here, as indicated, defendant had no constitutional right at the penalty phase to a jury trial. His waiver of the statutory right, moreover, was not a consequence of his stipulation to admission of the witnesses' former testimony, but preceded it. (Cf. *People* v. *Phillips, supra,* 172 Cal.App.3d at p. 673.) Further, by agreeing to the stipulation defendant did not incriminate himself by an "involuntary confession of guilt" (*Wright, supra,* 43 Cal.3d at p. 495) or, in terms applicable to the penalty phase, an involuntary concession that death was the appropriate penalty; to the contrary, he offered a complete and skillful defense. Nor did defendant surrender the right to confront and cross-examine the witnesses against him; rather, defendant expressly reserved the right to call the witnesses whose former testimony was admitted. As we recognized in *People* v. *Hendricks, supra,* 43 Cal.3d at pages 592-593, involving counsel's failure in a jury trial to present a defense, there is no surrender of any one or more of the three specified constitutional rights "when the defendant undergoes—and thereby exercises his right to—a jury trial and *has the opportunity* to cross-examine the witnesses against him and to refuse to incriminate himself." (Italics added.) We perceive no reason for a different conclusion when the defendant undergoes a court trial.

Here defendant had the opportunity in the prior proceedings to confront and cross-examine the witnesses whose former testimony was admitted and he exercised that right. He preserved the opportunity—by reserving the right to call the witnesses—in the penalty trial. In these circumstances, counsel's choice ultimately to exercise defendant's right of confrontation in only a limited manner was not a "submission," but rather, was no more than a tactical decision within counsel's discretion to make. (See *People* v. *Hendricks, supra,* 43 Cal.3d at pp. 592-594; *People* v. *Ratliff* (1986) 41 Cal.3d 675, 697 [224 Cal.Rptr. 705, 715 P.2d 665]; *People* v. *Williams*

(1970) 2 Cal.3d 894, 905 [88 Cal.Rptr. 208, 471 P.2d 1008]; *People* v. *Hall* (1979) 95 Cal.App.3d 299, 314-316 [157 Cal.Rptr. 107]; see also *People* v. *Chasco* (1969) 276 Cal.App.2d 271, 274-276 [80 Cal.Rptr. 667] (opn. by Kaus, P. J.).) "Once a defendant has elected to proceed with a contested trial, rather than plead guilty or accept sentencing based upon a preliminary examination transcript, the manner of presenting evidence . . . becomes one of trial tactics properly vested in counsel, at least in the absence of a conflict between counsel and his client." (*People* v. *Ratliff, supra,* p. 697, citing *People* v. *Hill* (1971) 19 Cal.App.3d 306, 315-316 [96 Cal.Rptr. 813]; see also *People* v. *Frierson* (1985) 39 Cal.3d 803, 818, fn. 8 [218 Cal.Rptr. 73, 705 P.2d 396].) Although defendant would have us reach a contrary conclusion based on the sheer number of witnesses whose testimony was admitted, we perceive no meaningful basis for the distinction.

 We recognize that trial counsel in the guise of a tactical choice cannot deprive a defendant of his basic constitutional rights (*People* v. *Frierson, supra,* 39 Cal.3d at pp. 812-817; *Townsend* v. *Superior Court* (1975) 15 Cal.3d 774, 781 [126 Cal.Rptr. 251, 543 P.2d 619]) and that the *Boykin-Tahl* rule applies to tactical decisions that implicate those rights (e.g., *People* v. *Hall* (1980) 28 Cal.3d 143, 157, fn. 9 [167 Cal.Rptr. 844, 616 P.2d 826]). In the instant case there was no deprivation. Rather, counsel reserved the right to call and cross-examine all the witnesses, but as a tactical matter determined it was to defendant's advantage not to have the witnesses testify in person.

 Even assuming, arguendo, that the stipulation in this case constituted a "submission" within the meaning of *Tahl, supra,* 1 Cal.3d 122 and *Bunnell, supra,* 13 Cal.3d 592, clearly the submission was not tantamount to a concession that death was the appropriate penalty. In these circumstances the trial court was not constitutionally compelled to adhere to the requirements of *Boykin-Tahl* (*Wright, supra,* 43 Cal.3d at pp. 495, 497); hence, the reasonable possibility standard of review applies. (*People* v. *Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].)

Unless we indulge in mere speculation and conjecture, on this record we can come to no conclusion other than the following: Had defendant been advised of his right of confrontation and privilege against self-incrimination and then validly waived his rights, the submission procedure would have been the same with the same result. Had he instead chosen not to make the waivers, the result likewise would have been the same. The witnesses whose former testimony was admitted had been cross-examined at one of the prior proceedings and in some cases at more than one. Consequently, if defendant had chosen not to make a waiver, all or at least substantially all of the 18 witnesses whose prior testimony was admitted by stipulation and who did

not testify would have given live testimony to the same or substantially the same effect. We thus conclude that the court's error, if any, in failing to give the required advisements and take defendant's waivers was nonprejudicial.

## D. Use of Unadjudicated Criminal Activity.

### 1. Due Process.

Former section 190.3 permitted the presentation of penalty phase evidence of "other criminal activity by the defendant which involved the use or attempted use of force or violence," and provided that "criminal activity does not require a conviction." At defendant's penalty trial Ernest F. and Catherine A. testified to defendant's attacks upon them. In neither instance had charges been filed against defendant.

■ Defendant contends that admission of prior unadjudicated incidents of criminal activity violates due process. We considered and rejected a similar claim in *People v. Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480], decided under the 1978 death penalty law. (Accord, *People v. Gates* (1987) 43 Cal.3d 1168, 1202 [240 Cal.Rptr. 666, 743 P.2d 301].) As defendant acknowledges, the 1977 law is identical in relevant part. (See generally *People v. Phillips* (1985) 41 Cal.3d 29, 69-72 [222 Cal.Rptr. 127, 711 P.2d 423].) Because defendant advances no persuasive reason to reconsider *Balderas,* we adhere to that decision.

### 2. Statute of Limitations.

■ Relying on *Phillips, supra,* 41 Cal.3d 29, and section 15, defining a crime in part by the punishments imposed after *conviction,*[7] defendant asserts that because prosecution of the 1973 Ernest F. attack and the 1977 Catherine A. attack was barred by the statute of limitations, he could not be convicted of either incident; hence neither constituted a "crime" within the meaning of the death penalty statute. Although defendant failed to advance a statute of limitations objection below, we nevertheless consider the objection here. (Cf. *People v. Chadd* (1981) 28 Cal.3d 739, 756-757 [170 Cal.Rptr. 798, 621 P.2d 837].)

In *Phillips* we held the term "criminal activity" in former section 190.3 includes more than prior felony convictions, but excludes offenses for which

---

[7]Section 15 provides in relevant part: "A crime or public offense is an act committed or omitted in violation of a law forbidding or commanding it, and to which is annexed, upon conviction, either of the following punishments: [¶] 1. Death; [¶] 2. Imprisonment; [¶] 3. Fine; [¶] 4. Removal from office; or, [¶] 5. Disqualification to hold and enjoy any office of honor, trust or profit in this State."

the defendant has been acquitted and "nonoffenses for which the defendant could not even be tried." (41 Cal.3d at pp. 71-72.) As subsequent language in *Phillips* makes clear, our purpose was to define the kinds of *behavior* by the defendant the statute makes relevant to choice of sentence—to wit— "actual conduct" involving violence or threat of violence that demonstrates the violation of a penal statute. (*Id.* at p. 72 & fn. 24; cf. *People* v. *Gates, supra,* 43 Cal.3d 1168, 1203 [probative value of conduct, not conviction, in penalty phase].) To exclude violent criminal behavior simply because its prosecution is time-barred would be to ignore the plain terms of former section 190.3 as well as its underlying purpose—i.e., that the trier of fact, in determining penalty, make an individualized determination on the basis of the character of the offender as well as the circumstances of the offense. (See *Zant* v. *Stephens* (1983) 462 U.S. 862, 879 [77 L.Ed.2d 235, 103 S.Ct. 2733]; *People* v. *Jennings* (1988) 46 Cal.3d 963, 981-982 [251 Cal.Rptr. 278, 760 P.2d 475] [1978 law]; see generally *People* v. *Phillips, supra,* 41 Cal.3d at pp. 69-72.)

The conduct underlying the Ernest F. and Catherine A. attacks clearly falls within one or more penal statutes (e.g., §§ 261 [rape], 207 [kidnapping], 288a, subd. (c) [forcible oral copulation], 286, subd. (c) [forcible sodomy]); hence it was properly considered as other "criminal activity." (See generally *People* v. *Jennings, supra,* 46 Cal.3d at pp. 981-982.)

Defendant argues additionally that because the statute of limitations had run on the incidents, evidence of the alleged offenses was inadmissible under the due process clauses of the federal and state Constitutions. In support, he argues the evidence related to attacks remote in time and thus difficult to defend against. We doubt whether either attack—that on Ernest F. in 1973 or on Catherine A. in 1977—can properly be characterized as "remote." Nor does the statute of limitations of itself embody a due process limit on the time within which a defendant can be required to defend against a particular charge. Rather, as the United States Supreme Court recognized in *United States* v. *Marion* (1971) 404 U.S. 307, 322 [30 L.Ed.2d 468, 92 S.Ct. 455], statutes of limitation "represent legislative assessments of relative interests of the State and the defendant in administering and receiving justice; . . ." That these assessments are flexible and not immutable is demonstrated, inter alia, by the Legislature's frequent amendment of section 800, proscribing the limitations period for serious felonies, including defendant's criminal activity. (See Historical Note, West's Ann. Pen. Code (1985 ed.) foll. § 800, p. 194.)

In *People* v. *Morris* (1988) 46 Cal.3d 1, 14-15 [249 Cal.Rptr. 119, 756 P.2d 843] we rejected the claim that a time-barred felony may not form the predicate for a felony-murder special circumstance. "A fortiori, there is no

bar to consideration of [time-barred] felonious conduct involving force or the threat of force as an aggravating factor." (*Jennings, supra,* 46 Cal.3d at p. 982.)

3. *Evidence Code Section 352.*

██ Defendant objected to admission of the Ernest F. and Catherine A. evidence on Evidence Code section 352 grounds. The court overruled the objection, but granted defendant leave to move to strike the evidence at a later time. Defendant failed to make a subsequent motion to strike and expressly withdrew his objection to the evidence. He now argues the court erred in failing to make an explicit on-the-record finding that the probative value of the evidence outweighed its prejudicial effect. (*People v. Green* (1980) 27 Cal.3d 1, 25 [164 Cal.Rptr. 1, 609 P.2d 468].)

Defendant, having withdrawn his objection to the evidence, cannot now complain of its admission. ██ Further, we reject the proposition that at the penalty phase of a capital trial the court has discretion under Evidence Code section 352 to exclude evidence of unadjudicated criminal activity involving violence. To the contrary, the evidence is expressly made admissible by former section 190.3. (See *People v. Karis* (1988) 46 Cal.3d 612, 641 [250 Cal.Rptr. 659, 758 P.2d 1189] [1978 law].)

4. *Reliability and Sufficiency of the Evidence.*

██ Defendant complains evidence of the Ernest F. and Catherine A. offenses was unreliable, as each was established by only a single witness. Our law, however, expressly provides that the testimony of a single witness is sufficient to establish a fact. (Evid. Code, § 411.) Any contradictions, as defendant asserts, or other weakness in the witness's testimony are matters to be explored on cross-examination and argued to the trier of fact. The reliability of the evidence is safeguarded by the requirement that the trier of fact may consider the evidence only if it determines the other crimes have been proved beyond a reasonable doubt. (*Robertson I, supra,* 33 Cal.3d at pp. 53-55.)

Defendant maintains that in neither instance did the evidence establish "criminal activity" beyond a reasonable doubt. ██ In reviewing the sufficiency of the evidence, our task is to determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255], quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781], italics in

original; accord, *People* v. *Guerra* (1985) 40 Cal.3d 377, 385 [220 Cal. Rptr 374, 708 P.2d 1252].) ▮▮▮ Applying this test, we conclude that a rational trier of fact could have found beyond a reasonable doubt that defendant had used force or the threat of force to compel F. and A. to commit oral copulation (§ 288a, subd. (c)).

### 5. *Lack of Notice.*

▮▮▮ Before defendant's first trial the prosecution gave notice that it would introduce evidence of the Kim P. attack in aggravation at the penalty phase, which it did. The prosecution did not give notice that it would introduce evidence of the Ernest F. and Catherine A. attacks, nor did it attempt to introduce such evidence. More than three months before commencement of the penalty phase retrial, however, the prosecution gave notice that it would introduce in aggravation evidence concerning the Ernest F. and Catherine A. attacks, as well as the Kim P. attack. Defendant claims the Ernest F. and Catherine A. evidence was inadmissible under the notice requirement of former section 190.3.[8]

The record is unclear that defendant raised the notice objection below. Assuming arguendo that he did so, he subsequently, for tactical reasons, expressly withdrew his objections to the Ernest F. and Catherine A. evidence; hence he may not raise the claim on appeal. (*People* v. *Rogers* (1978) 21 Cal.3d 542, 547-548 [146 Cal.Rptr. 732, 579 P.2d 1048].)

Defendant's objection in any event lacks merit. The meaning of "trial" varies depending on the context of its use. (See generally *People* v. *Overstreet* (1986) 42 Cal.3d 891, 896 [lead opn. of Broussard, J.], 902-903 [dis. opn. of Grodin, J.; Lucas, J. and Panelli, J., conc.] [231 Cal.Rptr. 213, 726 P.2d 1288].) ▮▮▮ As it is commonly and ordinarily construed, the word "trial" refers broadly to the formal examination of the matter in issue in a judicial tribunal for the purpose of determining such issue. (See Webster's Third New Internat. Dict. (1961) p. 2439, col. 3, definition 2.) ▮▮▮ Where the question of notice arises in the context of the initial trial in which the guilt and penalty phases occur in immediate sequence and thus are part of a unitary proceeding, we have construed "trial" as the whole proceeding; hence notice must be given in advance of the guilt phase. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 96-97 [241 Cal.Rptr. 594, 744 P.2d 1127].) Where, however, as here, the notice issue arises in the context of a second trial—i.e., a "retrial"—following a successful appeal, "trial" must

---

[8]Former section 190.3 provided in relevant part that "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time, as determined by the court, prior to trial." (Stats. 1977, ch. 316, § 11, p. 1259.)

reasonably be construed to mean the judicial proceeding in which the matter in issue is again examined and resolved. Only this construction serves both the evident purpose of the notice provision—viz., "to advise an accused of the evidence against him so that he may have a reasonable opportunity to prepare a defense at the penalty trial" (*Miranda, supra,* at p. 96 [1978 law])—and the overriding purpose of section 190.3 that the jury "be made aware of all of the factors bearing on the penalty decision" (*People* v. *Jennings, supra,* 46 Cal.3d at p. 987 [1978 law]). We conclude, therefore, that the "trial" to which former section 190.3 refers embraces the original trial, as defined above, or the retrial, be it of the entire proceeding or the penalty phase only.

Pursuant to the foregoing, former section 190.3 required the prosecution to give notice of aggravating evidence at a reasonable time prior to trial or retrial. By filing its notice more than three months prior to retrial of the penalty phase, the prosecution satisfied the notice requirement of the statute.

### 6. *Double Jeopardy.*

By analogy to the constitutional prohibition against retrial after acquittal or increased charges or punishment following a successful appeal (e.g., *Blackledge* v. *Perry* (1974) 417 U.S. 21 [40 L.Ed.2d 628, 94 S.Ct. 2098]; *North Carolina* v. *Pearce* (1969) 395 U.S. 711 [23 L.Ed.2d 656, 89 S.Ct. 2072]), defendant argues that because the prosecution failed to introduce the F. and A. incidents at his first trial, double jeopardy principles preclude their use at retrial. (See *Arizona* v. *Rumsey* (1984) 467 U.S. 203, 210-211 [81 L.Ed.2d 164, 104 S.Ct. 2305].)

Defendant's argument is meritless. The prohibition against double jeopardy protects a defendant from being placed twice in jeopardy for the same offense. (U.S. Const. Amend. V; Cal. Const., art. I, § 15; see generally *People* v. *Melton* (1988) 44 Cal.3d 713, 756, fn. 17 [244 Cal.Rptr. 867, 750 P.2d 741].) The prohibition has no bearing on the kind or quantity of evidence that may be introduced in successive trials of an issue. Defendant was never once in jeopardy for any offense arising out of the attacks against Ernest F. and Catherine A. The prosecution was plainly entitled to introduce evidence of these incidents at the second time.

### E. *Circumstances of the Kim P. Attack.*

As a consequence of the attack on Kim P., defendant was charged with four felony counts: kidnapping (§ 209); assault with a deadly weapon

(§ 245, subd. (a)); assault by means of force likely to produce great bodily injury (*ibid.*); and "sex perversion" (§ 288a). Pursuant to a negotiated disposition, defendant subsequently pled guilty to violation of section 288a— oral copulation by use of force or violence—in exchange for dismissal of the kidnapping and assault charges. At defendant's penalty trial, the prosecution called Kim P. to testify regarding the underlying circumstances of defendant's section 288a conviction as well as the other charges that were dismissed. ■■■ Although he made no objection below, defendant now contends Kim P.'s testimony amounted to an impermissible relitigation of both the section 288a conviction and the collateral dismissed charges.

In *People* v. *Gates, supra,* 43 Cal.3d at page 1203, we rejected a claim under the 1978 law that the prosecution should not be allowed to present testimony concerning a prior conviction involving violence to which the defendant offered to stipulate. We stated: "When dealing with violent conduct it is not the *fact* of conviction which is probative in the penalty phase, but rather the *conduct* of the defendant which gave rise to the offense." (Italics in original.) Hence, the statute permits the introduction of all evidence of violent crimes whether or not they resulted in a conviction, except those of which the defendant has been acquitted. (*Ibid.*; accord, *People* v. *Karis, supra,* 46 Cal.3d 612, 640; *People* v. *Melton, supra,* 44 Cal.3d 713, 754; see also *People* v. *Ghent* (1987) 43 Cal.3d 739, 774 [239 Cal.Rptr. 82, 739 P.2d 1250] [evidence of dismissed charges].) This principle is equally applicable to the 1977 statute, which is identical in relevant part. (Stats. 1977, ch. 316, § 11, p. 1259.)

Relying on *People* v. *Harvey* (1979) 25 Cal.3d 754, 758 [159 Cal.Rptr. 696, 602 P.2d 396], defendant urges that introduction of evidence of the charges dismissed pursuant to his plea bargain violated the understanding implicit in the bargain that he would suffer no adverse sentencing consequences by reason of the facts underlying the dismissed counts. In *People* v. *Melton, supra,* 44 Cal.3d at pages 755-756, we rejected the identical contention. For the reasons stated therein, defendant's argument must fail.

F. *Admissibility of Defendant's Statements to Experts.*

■■■ Although he failed to object at trial, defendant asserts error in the admission in the prosecution's case-in-chief of expert testimony relating several statements he made in the course of psychiatric and psychological interviews.[9] He complains the evidence was irrelevant to the determination

---

[9] Defendant complains, inter alia, of the following statements: (1) he once contracted venereal disease while in Vietnam; (2) he had a consensual homosexual encounter in prison; (3) during his eight years in the Army, he once was AWOL; (4) he missed some therapy sessions during the probation period before the homicides; (5) he once received a traffic ticket; (6) he

of penalty (e.g., *People* v. *Boyd* (1985) 38 Cal.3d 762, 775-776 [215 Cal.Rptr. 1, 700 P.2d 782]) and violative of the principles of reliability (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 771 [175 Cal.Rptr. 738, 631 P.2d 446]) and guided discretion (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 302-303 [49 L.Ed.2d 944, 96 S.Ct. 2978]) applicable to capital sentencing.

In *Murtishaw, supra,* this court noted that under the 1977 death penalty law "evidence of defendant's character and mental condition" may be admitted at the penalty phase even if not specifically linked to a statutory sentencing factor. (29 Cal.3d at p. 773; see *People* v. *Boyd, supra,* 38 Cal.3d at p. 772.) As factors to consider, moreover, the 1977 statute, like the 1978 law, specifically listed whether or not the defendant was under the influence of "extreme mental or emotional disturbance" and whether or not at the time of the offense he was suffering from diminished capacity "as a result of mental disease." (See *Murtishaw, supra,* at p. 772, fn. 35.)

Defendant's statements to the prosecution psychiatrists and psychologists—in particular, given the nature of the offenses, those relating to his sexual behavior—were relevant to their evaluation of his mental state, which in turn was directly relevant to the ultimate issue of appropriate penalty. Consequently, under the 1977 law, introduction of the evidence in the prosecution's case-in-chief was not error. (Cf. *People* v. *Mosher* (1969) 1 Cal.3d 379, 399 [82 Cal.Rptr. 379, 461 P.2d 659].)

Citing *Murtishaw, supra,* 29 Cal.3d at page 771, defendant argues the statements were unreliable because contradicted by himself and other witnesses. *Murtishaw,* relating to the general unreliability of psychiatric predictions of future dangerousness, is inapposite. Defendant's statements were offered not for their truth, but as part of the sum total of factors considered by the prosecution experts in evaluating defendant. Any contradiction in the statements goes not to their admissibility, but to the weight of the experts' opinions insofar as they relied on the statements.

G. *Failure to Identify Applicable Law.*

■ Defendant contends the record is ambiguous as to the legal principles the trial court applied to its determination of penalty, thus rendering meaningful appellate review impossible. (See, e.g., *Gregg* v. *Georgia* (1976) 428 U.S. 153, 188-189, 204-207 [49 L.Ed.2d 859, 96 S.Ct. 2909]; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 778 [230 Cal.Rptr. 667, 726 P.2d 113]; cf.

occasionally smoked marijuana and once tried mescaline; (7) he began masturbating at age 13; (8) he kept female undergarments under his mattress.

*People* v. *Lanphear* (1984) 36 Cal.3d 163, 169 [203 Cal.Rptr. 122, 680 P.2d 1081].) He urges trial judges should be required to designate the instructions they intend to use in reaching their penalty decisions.

Contrary to defendant's premise, the court expressly stated the law it would apply, i.e., former section 190.3, except as to the points on which current section 190.3 was more favorable to defendant.[10] The applicable statutes sufficiently set forth the procedures to be followed, the factors to consider and the manner in which the sentencing decision is to be made. Designation of correlative instructions thus is not necessary to permit meaningful appellate review.

In a related argument, defendant asserts the court erred at the time it rendered its sentence finding in failing to specify which, if any, of the more favorable provisions of the 1978 statute it had applied. He argues he may thus have been denied the benefit of the 1978 law's apparent mandate of a life sentence when mitigation outweighs aggravation. The court, however, expressly stated it would be bound by the 1978 law if it found that mitigating circumstances outweighed aggravating circumstances. (See fn. 10, *ante*.) The record is clear the court determined such not to be the case. (Cf. *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 783-784.)

---

[10]The relevant colloquy is as follows: "[THE COURT:] I did want to comment on one thing. Both counsel have referred to Section 190.3. And, of course, as we are all aware, that has been amended by the initiative that went into effect. The initiative went into effect in November of 1978, in any event. The Court is of the opinion that the Court should consider the act as it existed at the time of the alleged offenses unless there's some more favorable points in the initiative, in which event then Mr. Robertson's entitled to have whichever is the most favorable to his side. Do you agree with that?

"MR. McDOWELL [Prosecutor]: People agree with that statement, yes, Your Honor.

"THE COURT: There aren't any substantial changes other than the fact that in the initiative they allowed the Court to consider any felony convictions, which was not permitted under the 1977 act. I'm not, at this point, conscious of any other felonies that were proven in this case in any event, so it probably doesn't apply.

"Also, there was a fact, the circumstances about instructing a jury about the effect of the right of the governor to commute the sentence. Of course, being a judge and a lawyer, why, there's no way I can ignore the fact that I have that knowledge. But I won't consider it in arriving at my decision. It won't affect my decision one way or the other.

"The only other matter I see that there's been any substantial change in, that is, that under subsection K of the initiative, the guidelines for making the determination are more solidified. It says that 'If the Court finds aggravating circumstances outweigh the mitigating, it shall give the death penalty. If the Court finds that the mitigating factors outweigh the aggravation, it shall give life imprisonment without possibility of parole.' I think perhaps to the point that it is favorable to Mr. Robertson, I would be bound by those standards. If the Court finds facts that indicate to the contrary, then the court would not be bound, even though the Court found that the aggravating circumstances outweighed the mitigating it would not be bound then to impose the death penalty."

## H. *Misinterpretation and Misapplication of the Law.*

### 1. *Davenport Error.*

In determining sentence, the trial court began by discussing each of the statutory factors listed in former section 190.3. As to factor (c), whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance, the court found defendant was not acting under such influence, stating in part: "Specifically, the Court finds that the defendant was not acting under a post-traumatic stress disorder or under the psychotic state defined as brief reactive psychosis." As to factor (g), whether or not at the time of the offense the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or the effects of intoxication,[11] the court found there was no such impairment. Thereafter, the court summarized its findings. At the conclusion of its statement of applicable aggravating factors and before reciting the applicable mitigating factors, the court repeated its finding of no evidence of mental or emotional disturbance to support factor (c) nor evidence of impaired capacity under factor (g). Relying on *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861], defendant argues the trial court improperly considered the absence of mitigating factors as factors in aggravation.

In *Davenport* this court held the prosecutor erred in arguing to the jury that the absence of certain mitigating factors, not relevant to the evidence in the case, rendered each of them an aggravating factor. (41 Cal.3d at pp. 289-290.) In *People* v. *Rodriguez, supra,* 42 Cal.3d at pages 789-790, we distinguished *Davenport* and held the prosecutor did not err in merely pointing out to the jury the inapplicability of a mitigating factor. (Accord, *People* v. *Ghent, supra,* 43 Cal.3d at p. 775.)

In the present case factors (c) and (g) were relevant to the evidence; indeed, they were the crux of defendant's case in mitigation. Viewed in context, the court's reference to the absence of evidence supportive of factors (c) and (g) was no more than a statement that defendant had failed in his attempt to prove potentially significant mitigating circumstances. (Cf. *Rodriguez, supra,* 42 Cal.3d at p. 790.)

### 2. *Boyd Error.*

In concluding its summary of the applicable aggravating factors, the court stated that it had "also considered the fact that at the time of the

---

[11] The court added impairment by result of "mental defect," stating it did so by direction of this court. (See *Robertson I, supra,* 33 Cal.3d at pp. 59-60.)

murders defendant was on probation from the crimes committed against Kim [P.] and was actually undergoing therapy at that time." ▆▆▆ Relying on *People* v. *Boyd, supra,* 38 Cal.3d 762, defendant asserts the court erred in considering in aggravation the nonstatutory factors of defendant's probation status and therapy participation.

In *Boyd* we held that under the 1978 death penalty statute the prosecution's case for aggravation is limited to evidence relevant to the listed factors exclusive of factor (k)—"since that factor encompasses only extenuating circumstances and circumstances offered as a basis for a sentence less than death . . . ." (38 Cal.3d at pp. 775-776.) We thus distinguished the 1978 statute from its 1977 predecessor, under which evidence of defendant's character and mental condition was admissible if "relevant to aggravation, mitigation, and sentence" (former § 190.3, 1st par.), even if it did not relate to any specific aggravating or mitigating factor. (38 Cal.3d at p. 772.) Defendant argues his probation status and therapy participation are relevant under neither the 1977 death penalty law—which he concedes is generally applicable to this case, nor under the 1978 law—which he maintains is applicable on this point.

Because defendant committed the offenses when the 1977 law was in effect, that statute's provisions governed the penalty retrial. Although the trial court, as indicated, expressed its intent to apply any provisions of the 1978 law it deemed more favorable than the 1977 law—in effect, to give defendant the "best of both worlds"—in so doing, it gave defendant more than he was entitled to. A capital trial must be held under the death penalty law in effect at the time the capital offenses were committed; application of any other law is error. (*People* v. *Easley* (1983) 34 Cal.3d 858, 883 [196 Cal.Rptr. 309, 671 P.2d 813].) *People* v. *Collins* (1978) 21 Cal.3d 208 [145 Cal.Rptr. 686, 577 P.2d 1026] and *People* v. *Rossi* (1976) 18 Cal.3d 295 [134 Cal.Rptr. 64, 555 P.2d 1313], cited by defendant, are inapposite. Both cases deal with the legislative decriminalization of conduct, the effect of which is to put an end to all prosecutions and proceedings under the repealed statute not reduced to final judgment. (*Rossi, supra,* at p. 302; cf. *In re Estrada* (1965) 63 Cal.2d 740 [48 Cal.Rptr. 172, 408 P.2d 948] [legislative mitigation of punishment].) The replacement of the 1977 death penalty law with the 1978 law had no bearing on the criminality of defendant's conduct or the severity of punishment therefor; hence the statute in effect at the time of the offenses governs.

Under the 1977 statute, the sentencer was permitted to consider evidence of " 'any matter relevant to . . . the defendant's character, background, history, mental condition and physical condition.' " (*People* v. *Murtishaw, supra,* 29 Cal.3d at p. 773.) Defendant's therapy and probation status

clearly were relevant to his character and background: they displayed a violation of the state's trust and indicated defendant's refusal or inability to learn from his prior misdeeds and to benefit from the help offered him. The trial court thus did not err in considering these facts.

### 3. *Dual Use of Aggravating Facts.*

■■■ Defendant maintains the court made an impermissible dual use of his prior violent criminal acts against Kim P., Ernest F. and Catherine A. when it cited those offenses under both factor (b), the presence or absence of violent criminal activity, and factor (c), whether or not the offenses were committed while the defendant was under the influence of extreme mental or emotional disturbance.

In *People* v. *Melton, supra,* 44 Cal.3d 713 we held that although an individual criminal act cannot be counted twice in aggravation for the same purpose, there is no constitutional obstacle to "separate consideration of properly distinct aspects of the penalty determination, even when those aspects happen to coexist in a single incident." (*Id.* at pp. 764-765.) Here, after reciting the prior offenses as factor (b) criminal activity, the court discussed their circumstances at length in reaching its determination under factor (c). Based on its evaluation of the circumstances surrounding the two charged crimes and the defendant's "criminal history," as reflected in the prior violent criminal acts, the court concluded defendant was not in the instant case acting under the influence of extreme mental or emotional disturbance; rather his purpose was sexual gratification.

Use of the prior criminal acts for the foregoing distinct purposes was not error.

### 4. *Sympathy Factor.*

■■■ Defendant asserts that ambiguity in the record concerning the court's consideration of sympathy requires reversal. Defendant acknowledges the court understood it could properly "consider" sympathy for defendant, but maintains it failed to understand that sympathy alone could form the basis for a life sentence.

We disagree. In making its sentence determination the court expressly noted that it could "properly consider sympathy or pity for the defendant in determining *whether or not to show mercy and spare the defendant from execution*" (italics added) and that defendant was "constitutionally entitled" to have it consider any "sympathy factor raised by the evidence."

As the basis for his claim of ambiguity, defendant points to the court's subsequent statement in ruling on his penalty-reduction application that although it recognized and considered sympathy factors raised by the evidence, "the Court still feels that it is bound to review the evidence and consider and take into account and be guided by aggravating and mitigating circumstances" set forth in the statute. Read in context, however, with the court's earlier express recognition that sympathy could form the basis for mercy, this statement was fully consistent with our subsequent decisions relied on by defendant. (E.g., *People* v. *Easley, supra,* 34 Cal.3d at pp. 875-879; *People* v. *Lanphear, supra,* 36 Cal.3d 163, 166-167; *People* v. *Brown* (1985) 40 Cal.3d 512, 536-540 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].) The record thus does not support an inference the court did anything other than give sympathy the weight it determined was appropriate in this case.

I. *Skipper Error.*

1. *Defendant's Future Conduct.*

■■■ Defendant contends the court failed to consider evidence of his lack of future dangerousness in prison in violation of *Skipper* v. *South Carolina* (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669] and related cases. In *Skipper* the trial court excluded evidence the defendant had conducted himself well in prison since arrest. On appeal the United States Supreme Court reversed, stating "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating. [Fn. omitted.] Under *Eddings* [v. *Oklahoma* (1982) 455 U.S. 104], such evidence may not be excluded from the sentencer's consideration." (*Id.* at p. 5 [90 L.Ed.2d at p. 7]; accord, *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1026-1027 [245 Cal.Rptr. 185, 750 P.2d 1342].)

In the instant case the court, in citing the mitigating factors it had considered, stated it had considered evidence of defendant's "general good conduct" while in custody of the county, as well as the "testimony of the two death row prison guards and the two death row prisoners concerning defendant's conduct while at San Quentin Prison, and, particularly, the changes in his attitude and his actions since his rebirth or newly found interest in the Bible and study of religion. Based on this testimony," the court stated, "the Court is of the opinion that as long as [defendant] is confined to prison, he will not pose any significant danger to the public, including other prisoners or prison officials." Thereafter, in summarizing the factors in aggravation and mitigation, the court stated, "The Court does not consider the fact that [defendant] does not appear to pose a threat to

society as long as he's confined to prison to be a factor either in aggravation or mitigation [of] punishment for these offenses."

Later, in reviewing its decision in connection with defendant's penalty-reduction motion, the court stated: "The sixth sympathy factor the Court considered was [defendant's] coming to the aid of Deputy Sheriff Coyle at some danger to himself. The Court also indicated at that time and the Court did consider in weighing these factors that after consideration of all the evidence it does not appear to the Court that [defendant] presently poses a threat to society as long as he's confined to a prison. And considering that I didn't consider that to be either in aggravation or mitigation, punishment, at least, but the Court did make it clear that the Court did not consider that an aggravating factor, the fact that he might still be a danger."[12]

In light of the court's recitation of defendant's lack of future dangerousness as a sympathy factor and its express statement that it "did consider in weighing these factors" that defendant would not pose a threat to society so long as he is confined to prison, we reject defendant's premise that the court failed to consider his future nondangerousness in determining penalty. It appears, rather, that the court recognized defendant's evidence was relevant mitigating evidence, but ultimately determined on balance the evidence was of inconsequential weight as against the factors in aggravation and insufficient to mitigate punishment.

 As the United States Supreme Court stated in *Eddings* v. *Oklahoma* (1982) 455 U.S. 104 [71 L.Ed.2d 1, 102 S.Ct. 869]: "Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law,* any relevant mitigating evidence. . . . The sentencer . . . may determine the weight to be given relevant mitigating evidence. But [it] may not give it no weight *by excluding such evidence from . . . consideration.*" (*Id.* at pp. 113-115 [71 L.Ed.2d at pp. 10-11], first italics in original, second italics added.) Continuing, the high court in a footnote stated: "We note that the Oklahoma death penalty statute permits the defendant to present evidence 'as to any mitigating circumstances.' [Citation.] *Lockett* [v. *Ohio* (1978) 438 U.S. 586] requires the sentencer *to listen.*" (*Id.* at p. 115, fn. 10 [71 L.Ed.2d at p. 11], italics added.)

*Franklin* v. *Lynaugh* (1988) 487 U.S. 164 [101 L.Ed.2d 155, 108 S.Ct. 2320], cited by defendant, is in accord. Under the procedure there at issue,

---

[12]The court's statement, that it did not consider as an aggravating factor that defendant might still be a danger, doubtless was in response to prosecution evidence of defendant's future dangerousness and intended to avoid any possible error under *People* v. *Murtishaw, supra,* 29 Cal.3d 773, wherein this court held it was reversible error under the 1977 death penalty law to admit in evidence an unreliable psychiatric prediction of the defendant's future dangerousness. (*Id.* at p. 771, fn. 33, & p. 774.)

the jury was instructed defendant would receive a sentence of death if it answered "yes" to two "Special Issues"—one being whether defendant would be dangerous in the future. Defendant asserted the procedure prevented the jury from giving independent mitigating weight to his good conduct in prison. The high court in a plurality opinion held otherwise. Because defendant's good conduct was relevant to the issue of future dangerousness, defendant, the lead opinion stated, "was accorded a full opportunity to have his sentencing jury consider and give effect to any mitigating impulse that [his] prison record might have suggested . . . ." (*Id.* at pp. 177-178 [101 L.Ed.2d at p. 168].) Concurring, Justice O'Connor, joined by Justice Blackmun, stated that "a State may not constitutionally prevent the sentencing body from giving effect to evidence relevant to the defendant's background or character . . . . Indeed, the right to have the sentencer consider and weigh relevant mitigating evidence would be meaningless unless the sentencer was also permitted to give effect to its consideration." (*Id.* at pp. 184-185 [101 L.Ed.2d at pp. 172-173].) The dissent agreed it was not enough that the jury be allowed to hear defendant's mitigating evidence; it must also be allowed to give independent mitigating weight to the evidence. (*Id.* at p. 191 [101 L.Ed.2d at p. 177] (dis. opn. of Stevens, J.).)

What the Supreme Court's death penalty jurisprudence condemns, as the dissent in *Franklin* observed, is "the erection of barriers to the jury's full consideration of mitigating evidence . . . ." (487 U.S. at p. 192 [101 L.Ed.2d at p. 177] (Stevens, J.); see also *Mills v. Maryland* (1988) 486 U.S. 367, 375 [100 L.Ed.2d 384, 394, 108 S.Ct. 1860].) In the case at bench there was no barrier to the trial court's full consideration of defendant's evidence of future nondangerousness. The record is clear the court admitted the evidence, listened to it and considered it; thereafter the court determined, as it was entitled to do, that in the circumstances of this case the evidence was of minimal or no weight as balanced against the circumstances of the crimes and defendant's pattern of violent conduct. In so doing the court did not err.

Were we, however, nevertheless to assume the court refused to consider this mitigating evidence, the question would be whether the court's refusal was harmless under the *Chapman* (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]) standard of review. (*People v. Lucero, supra,* 44 Cal.3d at p. 1032; see *Hitchcock v. Dugger* (1987) 481 U.S. 393, 398-399 [95 L.Ed.2d 347, 353, 107 S.Ct. 1821]; *Skipper v. South Carolina, supra,* 476 U.S. at p. 8 [90 L.Ed.2d at p. 9]; *People v. McLain* (1988) 46 Cal.3d 97, 109 [249 Cal.Rptr. 630, 757 P.2d 569]; cf. *Mills v. Maryland, supra,* 486 U.S. at p. 384 [100 L.Ed.2d at p. 400].)

Applying the *Chapman* test, we are of the view the court's failure, if any, to consider defendant's evidence of his lack of future dangerousness is

harmless beyond a reasonable doubt. As circumstances in aggravation the court found the defendant had been convicted of two separate counts of first degree murder personally committed by him, with jury findings of nine special circumstances (see fn. 2, *ante,* p. 28), as well as three prior acts of criminal violence involving threats of murder and mutilation and extraordinary physical abuse. The court found defendant planned the kidnappings for the purpose of sexual assault and gratification, as shown by his cruising around looking for potential victims, carrying the boning knife in violation of probation, and sharpening the knife between the first and second murders. His primary motivation in each of the murders "was to accomplish a sexual assault with infliction of pain and, ultimately, the murders as part of the infliction of pain and, also, to avoid detection"; he may have "actually preferred to use force because that then gave him an excuse for inflicting pain." From the manner in which the murders were committed, including "the extreme mutilation of the bodies before and after death," as well as the circumstances of the assaults on Ernest F., Kim P. and Catherine A.,[13] the court determined defendant obtained gratification from inflicting pain and discomfort, "both mental and physical" on his victims.

As against these aggravating factors the court weighed in mitigation that defendant is mildly mentally retarded, emotionally immature, suffers from personality disorders, has impaired judgment, and had a troubled childhood. The court also considered defendant's assistance to Deputy Sheriff Coyle and his record of good conduct in prison.

In reviewing its sentence choice at the penalty-reduction hearing, the court stated "the most aggravating factor of all in the Court's opinion was the factor of [defendant] attempting to remove the breasts, being unsuccessful, and then going out and sharpening the knife and taking it with him. I think this is the principal factor that finally caused the Court to weigh the matter in which it did, that the aggravating circumstances clearly outweighed the mitigating factors."

Contrary to defendant's assertion, this was not, in our view, a close case.[14] On the record before us, particularly the court's repeated express concern

---

[13] As recounted by the court, these circumstances include that defendant "held the knife to [Ernest F.'s] throat and later on to his groin and to his testicles," jabbing him "in the neck and the groin area and the testicles at knifepoint, causing extreme mental distress," repeatedly suggesting "he ought to mutilate [him] and leave him out on the desert"; that he "repeatedly threatened to kill [Kim P.], physically abused her with the Coke bottle until she was bleeding [from the vagina] and [burned] her by inserting a lighted cigarette into her vagina, as well as beating her about the head and breasts"; and that with Catherine A. "he threatened to kill her, also, and actually physically abused her by sodomizing her until she was bleeding and his bruising of her breasts."

[14] Defendant cites the trial judge's statement before pronouncing sentence that "this is probably the most difficult decision I have had to make" since becoming a judge and that he

with the circumstances of the offenses, including defendant's planning activity, and with defendant's pattern of violent sexual conduct, including his purpose and pleasure in inflicting extreme pain and mutilation on his victims, we find the court's failure, if any, to weigh in mitigation defendant's lack of future dangerousness could not have affected its penalty determination and is harmless beyond a reasonable doubt.

### 2. *Defendant's Age and Vietnam Experience.*

 In addition to the foregoing claim, defendant contends the court refused, or must be presumed to have refused, to consider evidence he presented concerning two other issues: his mental age and the effects of his military service in Vietnam.

Insofar as defendant's age is concerned, the point is untenable. In relevant part the court's statement of reasons was as follows.

"Factor H: 'The age of the defendant at the time of the crimes.' [¶] Under the facts of this case, the Court does not consider his age as either a mitigating or aggravating factor. Although most witnesses placed his intellectual development at about a 12-year level, he had fully matured physically, had served in the Job Corps and substantial time in the Army, including his two tours of duty in Vietnam. And according to his statements to the doctors, he had been a truck repairman and driver and a helicopter crew chief and a door gunner while in Vietnam. So considering those factors, the court doesn't feel that age is either a mitigating or aggravating factor."

It thus is clear the court considered defendant's age-related evidence, but determined the evidence did not rise to a sufficient level of persuasiveness to establish a mitigating circumstance. The record supports this determination. (See generally *People* v. *Brown, supra,* 46 Cal.3d at p. 456 and cases cited.) In a related vein the court later expressly noted as factors in mitigation defendant's mental retardation and emotional immaturity. There was no error.

Defendant's claim concerning the effects of his Vietnam experience is equally meritless. Under both factor (c)—whether the defendant was under

had "agonized over it greatly for three days." Viewed in context, it is evident the court's reference was not to any particular difficulty in determining the appropriate penalty for defendant, but rather, to a general difficulty in accepting the unfamiliar responsibility, usually borne by a jury, of determining sentence in a capital case. This is borne out by the court's remarks following defendant's jury waiver, where it stated: "Obviously I'm not anxious to assume this responsibility. It isn't the kind of responsibility that the Court takes lightly and it isn't the kind of responsibility that the court is anxious to seek. On the other hand, it is one of the responsibilities of the office that I hold at this particular time."

the influence of extreme mental or emotional disturbance, and factor (g)—whether mental disease or defect impaired the defendant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law, the court specifically found defendant "was not acting under a post-traumatic stress disorder." Under factor (j)—sympathy factors generally, the court specifically noted "the historical background information relating to the defendant provided by his mother and sister and the various expert witnesses, . . ." This background information necessarily included defendant's "substantial time in the Army, including his two tours of duty in Vietnam," referred to by the court in discussing defendant's mental age and testified to at length by defendant's expert, Mr. Wulbrecht. In these circumstances, failure expressly to refer to the general psychological effects assertedly arising out of defendant's Vietnam experience was not error.

## J. *Burden of Proof.*

■■■ Defendant contends the court erred when it ruled that "neither side has the burden of proof in the penalty phase of this trial . . . ." He recognizes this court has held the beyond-a-reasonable-doubt standard of proof on the question of the appropriateness of the death penalty is not constitutionally required. (See *People* v. *Frierson* (1979) 25 Cal.3d 142, 178-180 [158 Cal.Rptr. 281, 599 P.2d 587]; accord, *People* v. *Jackson* (1980) 28 Cal.3d 264, 315 [168 Cal.Rptr. 603, 618 P.2d 149]; *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779 [1978 statute].) He argues, however, the court erred in failing to allocate *any* burden on the prosecution. This omission, he asserts, opened the door "to a coin flip determination of the death penalty."

The court's statement related to the order and number of penalty phase arguments it would permit. In determining the question the court relied on *People* v. *Bandhauer* (1967) 66 Cal.2d 524, 531 [58 Cal.Rptr. 332, 426 P.2d 900], where this court stated: "At the trial on the issue of penalty, . . . neither side has the burden of proving that one or the other penalty is the proper one . . . ."

To say that neither side bears the burden is not, as defendant urges, to incur the risk the death sentence will be arbitrarily imposed. Prerequisite to imposition of that penalty the trier of fact must find true beyond a reasonable doubt at least one special circumstance and must consider, be guided by and weigh specific aggravating and mitigating circumstances. (*People* v. *Jackson, supra,* 28 Cal.3d at p. 315; *People* v. *Frierson, supra,* 25 Cal.3d at p. 180.) Pursuant to the 1978 statute, deemed applicable by the court in this respect, the death penalty can be applied only if the trier of fact finds

aggravating circumstances outweigh mitigating circumstances. (*People* v. *Rodriguez, supra,* 42 Cal.3d 730, 779.) Moreover, both the 1977 and the 1978 statute require the trial court to review the trier of fact's determination to assure the weight of the evidence supports it.

In sum, the court's burden-of-proof ruling was not error.

K. *Defendant's Absence From Penalty-reduction Hearing and Sentence.*

 Defendant contends his absence at the sentence-modification hearing and imposition of sentence requires reversal of the judgment. The facts relevant to this claim are as follows.

Immediately after the court announced its decision that the penalty in this case should be death, the court allowed defendant to make a statement. In his statement defendant expressed remorse for the death of the two women.[15] The court then set the matter for penalty-reduction hearing and sentencing. Defense counsel informed the court defendant wished to waive his presence at the penalty-reduction hearing. The court declined to take the waiver at that time, but asked counsel to prepare and submit a written waiver, which it would consider at a later time.

Six weeks later counsel filed a written waiver executed by defendant and approved by both defense counsel and the prosecutor. The waiver, an adaptation of the form set out in section 977, stated that defendant, having been advised of his right to be present at all stages of the proceedings, "hereby waives the right to be present at the hearing of any motion or other proceeding on this cause, . . . [including] when a motion to reduce sentence is heard, . . . The undersigned defendant hereby requests the court to proceed during every absence of his which the court may permit pursuant to this waiver, and hereby agrees that his interest will be deemed represented at all times by the presence of his attorneys the same as if the defendant himself were personally present in court . . . ."

At the commencement of the penalty-reduction hearing the court noted defense counsel were present and defendant was not and a waiver of defendant's appearance had been filed. The court further noted the form specifically waived defendant's presence at the modification hearing and "at all stages of the proceedings," but did not expressly refer to the time of imposi-

---

[15] Defendant said: "Your Honor, I know the crime I did was injust [*sic*] to the two girls, and I look at it with my remorse. If I could take my life right now and bring those two girls back to life, I would do it, but I know that I can't bring them back to life. And what you gave me, I understand, and thank you for hearing my case."

tion of sentence. Defense counsel agreed with the court's conclusion waiver of the latter was inferred from the document. The court then denied the penalty-reduction application and formally imposed the judgment of death.

Defendant's constitutional and statutory right to be present at the sentence modification hearing and imposition of sentence is not in dispute. (Cal. Const., art. I, § 15; *Faretta* v. *California* (1975) 422 U.S. 806, 819, fn. 15 [45 L.Ed.2d 562, 95 S.Ct. 2525]; *Snyder* v. *Massachusetts* (1934) 291 U.S. 97, 105-108 [78 L.Ed. 674, 54 S.Ct. 330, 90 A.L.R. 575]; *People* v. *Jackson, supra,* 28 Cal.3d at pp. 309-310; §§ 977, 1043.) The question is whether he could waive the right and, if so, did he effectively waive it here.

Defendant argues that in a capital case the personal presence of the defendant at every "critical phase" is mandatory and cannot be waived. In support he cites *Hopt* v. *Utah* (1884) 110 U.S. 574, 579 [28 L.Ed. 262, 4 S.Ct. 202] and two federal decisions, *Hall* v. *Wainwright* (11th Cir. 1984) 733 F.2d 766, 775-776 and *Bustamante* v. *Eyman* (9th Cir. 1972) 456 F.2d 269, 273-274 (plur. opn.).

Although in *Hopt, supra,* the United States Supreme Court stated a capital defendant could not waive his presence at a critical stage of the proceeding, the holding was based on a statute mandating the defendant's presence. (110 U.S. at p. 578 [28 L.Ed.2d at p. 265]; see *Diaz* v. *United States* (1912) 223 U.S. 442, 458 [56 L.Ed. 500, 32 S.Ct. 250]; see also *Snyder* v. *Massachusetts, supra,* 291 U.S. at p. 117, fn. * [What *Hopt* said about presence was dictum].) Subsequently, in *Snyder* v. *Massachusetts, supra,* at page 106 [78 L.Ed. at page 678], the high court stated the federal constitutional right "no doubt . . . may be lost by consent or at times even by misconduct." Thereafter, in *Illinois* v. *Allen* (1970) 397 U.S. 337, 343 [25 L.Ed.2d 353, 90 S.Ct. 1057], the court expressly held a defendant can lose his right to be present at trial if he conducts himself in a disruptive manner. Most recently, in *Drope* v. *Missouri* (1975) 420 U.S. 162, 182 [43 L.Ed.2d 103, 95 S.Ct. 896], the high court indicated the question of waiver was an open one. Notwithstanding the foregoing, the 11th Circuit has taken the view a defendant cannot waive his presence at any critical stage of trial. (*Hall* v. *Wainwright, supra,* 733 F.2d at p. 775; see also *Bustamante* v. *Eyman, supra,* 456 F.2d at p. 274 [lead opn. of Ferguson, J.].)

In *Peede* v. *State* (Fla. 1985) 474 So.2d 808, certiorari denied 477 U.S. 909 [91 L.Ed.2d 575, 106 S.Ct. 3286], the Florida Supreme Court took a different view. Observing that in *Drope, supra,* 420 U.S. 162, the United States Supreme Court expressly left open the question of whether presence at a capital trial may be waived, the court determined waiver was permissible. Subsequent to *Drope,* the Florida court noted, rule 43 of the Federal

Rules of Criminal Procedure, relating to the defendant's presence, was changed to eliminate the distinction between capital and noncapital cases, thus permitting a defendant in a capital as well as a noncapital case to waive the right to be present at trial in two circumstances. (474 So.2d at pp. 812-813.) The Florida Supreme Court concluded that "just as in noncapital cases, the presence requirement is for the defendant's protection and, just as he can knowingly and voluntarily waive any other constitutional right, a defendant can waive his right to be present at stages of his capital trial if he personally chooses to voluntarily absent himself. [Fn. omitted.]" (474 So.2d at p. 814.) To hold otherwise, the court reasoned, would force a defendant into "the untenable position of having to disrupt the courtroom to such an extreme as to result in his removal, thereby seriously prejudicing his case." (*Id.* at p. 815, citing *Illinois* v. *Allen, supra,* 397 U.S. at p. 344 [25 L.Ed.2d at p. 359]. See generally 3A Wright, Federal Practice and Procedure, Criminal 2d (1982) § 723, p. 18.)

The issue in this state evidently is of first impression. (Cf. *People* v. *Odle* (1988) 45 Cal.3d 386, 407 and fn. 8 [247 Cal.Rptr. 137, 754 P.2d 184] [waiver of presence for rereading of testimony]; *People* v. *Grant* (1988) 45 Cal.3d 829, 845-846 [248 Cal.Rptr. 444, 755 P.2d 894] [waiver at proceedings not necessitating defendant's presence].) Having considered the matter closely, we find the reasoning of the Florida Supreme Court persuasive. Permitting waiver, moreover, is consistent with the solicitude shown by modern jurisprudence to the defendant's prerogative to waive the most crucial of rights. ■ A capital defendant may waive counsel and represent himself in propria persona (*Faretta* v. *California, supra,* 422 U.S. 806; *People* v. *Joseph* (1983) 34 Cal.3d 936, 943 [196 Cal.Rptr. 339, 671 P.2d 843]), he may waive jury trial (*People* v. *Deere, supra,* 41 Cal.3d at pp. 359-360), he may decline to put on a defense in the guilt phase (*People* v. *Teron* (1979) 23 Cal.3d 103, 108 [151 Cal.Rptr. 633, 588 P.2d 773]), he may, with the consent of counsel, plead guilty to the underlying charges and the alleged special circumstances (*People* v. *Chadd, supra,* 28 Cal.3d 739, 746), he may testify to his preference for a sentence of death (*People* v. *Guzman* (1988) 45 Cal.3d 915, 961-962 [248 Cal.Rptr. 467, 755 P.2d 917]), and he need not participate in the presentation of the defense at the penalty phase (compare *People* v. *Teron, supra,* at pp. 108, 115, with *People* v. *Deere, supra,* 41 Cal.3d at pp. 363-364). ■ If a capital defendant may waive counsel to his detriment, and if other felony defendants may waive their right to presence at various stages of trial (e.g., §§ 977, 1043; *Taylor* v. *United States* (1973) 414 U.S. 17 [38 L.Ed.2d 174, 94 S.Ct. 194]; *People* v. *Rogers* (1957) 150 Cal.App.2d 403, 414-415 [309 P.2d 949]) and at sentence (§ 1193; *People* v. *Brown* (1951) 102 Cal.App.2d 60 [226 P.2d 609]), we see no sufficient reason not to permit a capital defendant to waive the right to be present as well. Our statutes governing waiver make no distinction

between *capital and other felony defendants* (see §§ 977, 1193); unless and until the United States Supreme Court should determine the federal Constitution requires it, we decline to impose such a distinction as a matter of state constitutional law.

We turn then to a determination of whether defendant validly waived his presence. In compliance with section 977, defendant's written waiver form, filed with leave of court, expressly stated he had been advised of and waived his right to be present when a motion to reduce sentence is heard. Although the form was not executed in open court as the statute requires, counsel earlier and in defendant's presence had orally informed the court of defendant's wish to be absent at the sentence-modification hearing (referred to by counsel as the "motion for new trial"), and the court had asked counsel to prepare and submit a written waiver. We believe defendant's waiver substantially complied with section 977 so as to constitute a valid waiver of his right to be present at the sentence-modification hearing. (See *In re Ibarra* (1983) 34 Cal.3d 277, 284-286 [193 Cal.Rptr. 538, 666 P.2d 980].)

We reach a contrary conclusion with respect to waiver of defendant's right to be present at the imposition of sentence. Although defendant could waive his right to be present at sentence (§ 1193; *People* v. *Brown, supra,* 102 Cal.App.2d 60), defendant's waiver form cannot reasonably be construed to embrace a knowing and intelligent waiver of his presence at the time of sentence. We must therefore determine the prejudicial effect of the error under the *Chapman* standard of review (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711]).

Defendant argues his absence at the imposition of sentence deprived him of the opportunity to address the court and make a statement before pronouncement of final judgment. Defendant, however, made a statement to the court following its sentence verdict and before the sentence modification hearing—at a time, therefore, when the court likely was most open to reassessment of its determination. In his statement defendant acknowledged his responsibility for his crimes and fully expressed his remorse. He stated he understood the court's decision and thanked it for hearing his case. At the time of pronouncement of judgment, therefore, the court had heard defendant's expression of remorse and had twice deliberated carefully and at length over the evidence presented and the arguments made. In the circumstances of this case, where defendant had spoken at the time that mattered most and where the court had already exercised its discretion and reviewed that exercise, we find little likelihood defendant would have chosen to be present at the time of judgment and further find that his absence was harmless beyond a reasonable doubt.

## L. *Cumulative Error.*

■ Defendant urges that if we find no single error of itself requires reversal, the cumulative impact of the errors was prejudicial. Central to his argument is the premise the court found the determination of penalty to be difficult and extremely close. As indicated, we reject this premise. (See fn. 14, *ante,* p. 56.) Having carefully reviewed the record and considered the matter closely, we are of the view there is no reasonable possibility of a result more favorable to defendant in the absence of any of the identified errors and their cumulative impact was harmless beyond a reasonable doubt. (*People* v. *Brown, supra,* 46 Cal.3d 432, 448; *Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].)

## M. *Constitutionality of 1977 Statute.*

■ Defendant asks that we reconsider the decisions in *People* v. *Frierson, supra,* 25 Cal.3d 142 and *People* v. *Jackson, supra,* 28 Cal.3d 264, which upheld the general constitutionality of the 1977 death penalty law. First, he urges reconsideration of our determination that proof beyond a reasonable doubt of the appropriateness of death is not constitutionally required. (*Frierson, supra,* 25 Cal.3d at p. 180; *Jackson, supra,* 28 Cal.3d at pp. 315-317; see also *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779 [1978 law].) He maintains that because far less valued interests are protected by the beyond-a-reasonable-doubt standard (e.g., *In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068] [adjudication of juvenile delinquency]; *People* v. *Feagley* (1975) 14 Cal.3d 338 [121 Cal.Rptr. 509, 535 P.2d 373] [adjudication of mentally disordered sex offender status]; *People* v. *Burnick* (1975) 14 Cal.3d 306 [121 Cal.Rptr. 488, 535 P.2d 352] [same]), it violates equal protection to execute individuals when there is a reasonable doubt as to the appropriateness of death.

Defendant's attempted analogy to fact-finding proceedings is inapt. At the penalty phase of a capital trial the defendant has already been proven guilty of a capital offense beyond a reasonable doubt. "[T]he sentencing function is inherently moral and normative, not factual; the sentencer's power and discretion under both the 1978 and 1977 provisions is to decide the appropriate penalty for the particular offense and offender under all the relevant circumstances." (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 779; cf. *People* v. *Bandhauer, supra,* 66 Cal.2d at pp. 530-531.) The statute's failure to impose a beyond-a-reasonable-doubt standard on the decision regarding the appropriateness of death is not violative of equal protection.[16]

---

[16] By letter after oral argument, defendant has directed our attention to the recent case of *Adamson* v. *Ricketts* (9th Cir. 1988) 865 F.2d 1011 in which the court declared the Arizona

Second, defendant asserts the 1977 statute violates the cruel and unusual punishment and due process clauses of the state and federal Constitutions. (Cal. Const., art. I, §§ 7, 15, 17; U.S. Const., 8th and 14th Amends.) We resolved these issues adversely to defendant in *People* v. *Frierson, supra,* 25 Cal.3d 142 and *People* v. *Jackson, supra,* 28 Cal.3d 264. We adhere to those decisions here.

### N. *Disproportionality.*

■ Pointing to his mental and emotional problems and difficult childhood, defendant argues his death sentence is constitutionally disproportionate. Having reviewed the record in its entirety, we believe that in view of the undisputed facts the claim must be rejected.

### III. CONCLUSION

The penalty judgment is affirmed.

Lucas, C. J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**MOSK, J.**—I dissent.

Like the majority, I recognize the enormity of defendant's crimes. Unlike the majority, I also recognize that prejudicial *Skipper* error (*Skipper* v. *South Carolina* (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669]) was committed at trial. In affirming the judgment of death, the majority choose to overlook the prejudicial error. In voting to reverse, I merely follow as I must the path of principle.

### I.

Before I can proceed to the discussion of *Skipper* error and its effect on the outcome, I must review the facts at some length.

The penalty phase was retried to the court pursuant to a waiver of jury trial by the prosecution and the defense. The judge on retrial was not the judge who had presided over the initial trial. Before the court by stipulation of the parties were transcripts of prior testimony in this action and testimony in a habeas corpus proceeding conducted subsequent to the initial trial.

death penalty statute unconstitutional for creating a presumption that death was the appropriate punishment. In light of the substantial differences between the Arizona death penalty statute and California's 1977 statute, we find nothing in *Adamson* to suggest a similar deficiency in the 1977 statute nor in the sentencing process in defendant's case. (See *People* v. *Easley, supra,* 34 Cal.3d 858, 883-884; see also fn. 10, *ante.*)

Those transcripts described the circumstances of the crimes charged. The tale is recounted in *People* v. *Robertson* (1982) 33 Cal.3d 21, 31-32 [188 Cal.Rptr. 77, 655 P.2d 279], which is quoted in the majority opinion, *ante,* at pages 28-30.

In its case-in-chief, the prosecution set out to show that the penalty of death was appropriate for defendant. At the penalty phase of the initial trial the defense had attempted to demonstrate that defendant's culpability was reduced by reason of mental disease or defect. In evident anticipation of the case it expected the defense to present here, the prosecution called several expert witnesses.

Dr. Otto Gericke, a psychiatrist, testified that defendant had a character disorder, was emotionally immature, exhibited adolescent attitudes and behavior, and was of low average intelligence; at the time of the crimes in question he was sane and acted with undiminished capacity; he had not suffered any major organic brain damage, had no mental disease or defect, was not a mentally disordered sex offender, and was not affected by posttraumatic stress disorder.

Dr. Oren McEwen, a psychologist, stated that defendant was of low average intelligence and had experienced rejection and overprotection as a child; he had a passive-aggressive personality disorder, a dysfunction arising out of dependency coupled with fear of loss of support and significant anger or rage; he had no psychosis or neurosis, did not suffer from any mental disease or defect, and was not affected by posttraumatic stress disorder.

Dr. Robert Flanagan, a psychiatrist, testified that defendant was a schizoid personality with a mixed character disorder with antisocial features; he was sexually aggressive, received gratification from inflicting pain, and had feelings of inadequacy; he was of average intelligence but lacked insight and had concern only for himself; he was not psychotic or neurotic, did not suffer from any mental disease or defect, and was not affected by posttraumatic stress disorder; he continued to be dangerous.

Dr. Charles Larkin, a psychiatrist, stated that defendant did not have a passive-aggressive personality disorder, but a personality disorder of a mixed type with antisocial, aggressive, and borderline features with poor impulse control; he was of borderline to low average intelligence; as a child he developed slowly and suffered emotional trauma; he exhibited antisocial behavior; he had no psychosis, mental disease, or reality distortion, was not affected by posttraumatic stress disorder, and had no neurological disorder; he might continue to be violent.

Dr. James Ramsaran, a psychiatrist, testified that defendant was a mentally disordered sex offender and had an antisocial personality disorder with a predisposition to commit acts to obtain sexual gratification.

Finally, Dr. David Tansey, a psychologist, stated that defendant had a passive-aggressive personality disorder with antisocial features.

To support its position that death was appropriate, the prosecution also introduced evidence of prior crimes. Ernest F. testified that one night in 1973, when he was a 19-year-old enlisted man in the Marine Corps, he went out drinking in Yuma, Arizona; at a bar he met a man who introduced himself as "Tex"; he and "Tex" went bar hopping; in the desert outside of Yuma, "Tex" attacked him, placing a knife to his neck and jabbing him with the weapon; "Tex" forced him to submit to oral copulation as he held the knife at his testicles and groin and jabbed; "Tex" repeatedly threatened to mutilate him and leave him in the desert, and also threatened to kill him; he offered no resistance to the attack, and soon managed to escape; he reported the incident to the police, but charges were never filed; at trial he stated that defendant was the man he had known as "Tex."

Kim P. testified that one night in 1976 she was standing in a parking lot at a truck stop in Ontario, California; a man approached her from behind, put a knife to her throat, and forced her into his automobile; they drove off; a citizen's band radio was on; soon, they arrived at a remote area; there, he compelled her to disrobe and then cut off her underpants with his knife; he told her he hated women, and repeatedly said he was goint to kill her; he beat her about the face, head, and breasts; he violated her with a Coca-Cola bottle until her vagina bled; he put lit cigarettes into her vagina and called her a "cry baby" when she complained of pain; he forced her to orally copulate him; he took a pair of underpants from a bag she had with her, saying they were for a collection he kept; soon the citizen's band radio crackled, he became distracted, and she fled; he cruised around the area for five or ten minutes shouting threats that he would kill her; she made good her escape and reported the incident to the police; she identified defendant as her assailant.

Defendant was subsequently charged with four felony counts as a result of his attack on Kim P.: kidnapping (Pen. Code, § 209), assault with a deadly weapon (*id.,* § 245a), assault by means of force likely to produce great bodily injury (*ibid.*), and "sex perversion," specifically, forcible oral copulation (*id.,* § 288a, subd. (d)). Pursuant to a negotiated disposition, he pleaded guilty to forcible oral copulation and the other charges were dismissed. He was sentenced to one year in jail, and was placed on probation for three years subject to, among other conditions, that he "Obtain compe-

tent psychiatric or psychological care or other counseling program" and "Neither possess nor have under his control any dangerous or deadly weapon."

Finally, Catherine A. testified that one night in 1977 a man driving a station wagon approached her as she was walking along a street in San Bernardino; he offered to pay her for sexual services; she accepted and then entered the vehicle; the man pulled a gun, said, "All right, you fucking whore bitch. I've got you now," and drove on; when they arrived at a remote area, he told her to get in the back of the station wagon and remove her clothing, and she did so; he repeatedly said he had to kill her; she asked why; he responded if he did not she would go to the police; she replied she would not since she had entered his car voluntarily—all the while generally attempting to mollify him; he sodomized her until she bled, forced her to orally copulate him, and masturbated in her face; he beat her breasts and seemed to be obsessed with them; he took her underpants, saying that he wanted them for a collection he kept; eventually, he told her to get out of the car, and she did so; he began to drive off, and she hurriedly dressed; he then turned the car back and she hid in a nearby cemetery; he drove up and down for about 20 minutes and eventually left; she did not report the incident at that time and charges were never filed; at trial, she identified defendant as her assailant.

In its case-in-chief, the defense endeavored to show that death was not the appropriate penalty: defendant had a traumatic childhood, was mildly mentally retarded, had low intelligence and poor judgment, and was in essence a 12-year-old boy in the body of a man; at the time of the crimes he was affected by posttraumatic stress disorder as a result of military service in Vietnam and by brief reactive psychosis; he had made an excellent adjustment to incarceration, had become sincerely religious, and would behave well in prison and pose no danger to others.

To support its position the defense introduced evidence, through defendant's mother and sister and expert witnesses, concerning defendant's life before the commission of the crimes in question. The evidence paints the following picture.

Defendant was born in Los Angeles in 1945, the product of a traumatic birth preceded by labor of almost two full days. He had an older sister. He developed slowly; he did not speak until he was about two years old, and did not walk until he was two and a half. At five, his parents were divorced. His mother was awarded custody of him and his sister. Shortly thereafter, his father kidnapped the children and took them to Virginia. Two years later his mother, by then remarried, got the children back. For the remain-

der of his childhood, defendant was dominated by his sister, who was cruel and overbearing, and was shuffled back and forth between his mother, who worked long hours and evidently had some psychological problems, and his grandmother, who was a strict disciplinarian; he was at once rejected and overprotected. From his earliest school days, he had difficulties: he had low mental ability, was hyperactive, received relentless abuse from his age-mates, and engaged in antisocial behavior. At nine years of age, he was examined by a neurologist, Dr. Guy Hunt, who diagnosed him as mildly mentally retarded and possibly brain damaged.

As he approached adulthood, defendant joined the Job Corps and served a term of about two years. In 1967 he enlisted in the Army. For the next eight years he served in the military. In that period, he did two tours of duty in Vietnam totalling almost three years. In Vietnam, he served as a truck repairman and driver and as a helicopter crew chief and door gunner. While there, he witnessed many horrors, experienced the loss of a stepbrother who was killed in combat, and himself participated in the savagery of war.

When he returned to the United States, defendant had difficulties adjusting to the less structured environment of the peacetime military; he had nightmares and sleeping problems, suffered from feelings of depression and detachment, and seemed to be living in "a fantasy world." In 1973, while stationed in Long Beach, he married a woman 12 years his senior who had 4 children by a previous marriage. The union quickly ended in divorce: he was unable to shoulder responsibility and was closer in mental and emotional level to his wife's children than to his wife.

In 1975 defendant attempted to reenlist in the Army but was refused. Thirty years old, he returned to his mother's home. He was unable to learn a usable skill and was unable to hold a job. In 1976 he attacked Kim P. and was sent to jail. In 1977 he was released and obtained an apartment in the same complex in which his mother lived. Later that year, he killed Karen Ann Litzau and Kimberly Gloe.

To support its position that death was not appropriate, the defense also presented expert testimony. Dr. Hunt, the neurologist who had examined defendant at age nine, stated that defendant had suffered organic brain damage that impaired his mental abilities and adversely affected his judgment and insight, was mildly mentally retarded, and was not amenable to treatment; he has had troubles since infancy and has not been able to get, or take advantage of, the normal opportunities of life because of his environment, because of his impaired intelligence, judgment, and insight, or because of other genetic factors; there appeared to be no specific mental disease from which defendant suffered and no plain psychiatric explanation

for his behavior, although it was possible that he was psychotic during the commission of the crimes in question; Dr. Hunt believed that defendant had suffered definite impairment of his mental functions and therefore should not be sentenced to death; he implied that defendant would pose no danger to others and would in fact do well in the structured setting of prison.

Dr. Robert Postman, a psychologist, testified that defendant was of below average intelligence, was probably mildly mentally retarded, and perhaps had an antisocial personality disorder; at the time of the crimes in question he was suffering from brief reactive psychosis rooted, inter alia, in a deep hatred of women; Dr. Postman believed that defendant would pose no danger to others in the structured setting of prison and would in fact be productive there.

Thomas S. Wulbrecht, the director of the Vietnam Veterans Outreach Center in Riverside, testified about defendant's experiences in Vietnam and the effects of those experiences on his psyche, giving substantially all the evidence on this point which is summarized above. Wulbrecht stated that defendant exhibited chronic posttraumatic stress disorder overlaid with an antisocial personality disorder; posttraumatic stress disorder could lead to a dissociative state wherein the subject would revert to the "survivor mode" of combat in an "altered state of consciousness"; the commission of the crimes in question was consistent with behavior in such a state; it was also consistent with behavior under brief reactive psychosis.

Finally, the defense presented evidence to show that defendant would not pose a danger to others if he was sentenced to life imprisonment without possibility of parole, and indeed would conduct himself well and lead a useful life within the limits imposed by incarceration.

Deputy Sheriff Roger Coyle testified that in 1976 and 1977 he worked at the Glen Helen Rehabilitation Center, at which county prisoners were housed; defendant was one of his charges; he conducted himself well in custody and never caused any disciplinary problems; on one occasion Deputy Coyle transported defendant and several other inmates to a county hospital; while there Deputy Coyle was attacked by one of the inmates, a fight ensued, and he lost control of his gun; at danger to himself defendant pushed the other inmates against a wall to prevent them from getting the gun.

Sergeant Gerald Riley, who had been a correctional officer on "Death Row" at San Quentin Prison, testified that defendant adapted readily to incarceration and was "an outstanding prisoner" and had "never been any problem. He's always—he just seems like he gets along with everybody well.

He gets along with staff well. He follows the rules, regulations"; he seems to have the intelligence of a fourth- or fifth-grader; he is a hard worker and eagerly does favors for the staff and other inmates; when he arrived on "Death Row," he had an obsessive interest in pornography; some time ago, however, he started studying the Bible with "Death Row" inmates Mariney Joseph and William Payton and became a "born-again" Christian; as a result, he put away pornography and became an even better prisoner than he had previously been; Sergeant Riley believed that defendant would pose no danger to others in prison.

Norvell Greene, who was a correctional officer on "Death Row," gave testimony that was similar in all respects to Sergeant Riley's; he emphasized that defendant was very passive, presented no disciplinary problems, and participated in religious activities with inmates Joseph and Payton.

Mariney Joseph, who was an inmate on "Death Row," testified that when he met defendant in 1980, defendant was obsessively interested in pornography; late in 1981, Joseph was baptized and began to study the Bible with defendant—"Mostly I would read to Andy because Andy can read, but he reads as if there's a period after every word. One word at a time"; when inmate Payton, who was also a "born-again" Christian, arrived on "Death Row," Joseph was able to further defendant's religious education—"Bill [Payton] had a friend that had sent some tape recorders to some of the Christians on the row and one to myself and one to Andy. And what we did, we got Andy the Bible on tape so he could listen to the Bible on tape. . . . Then Bill had his wife to send Andy a picture Bible, the kind that are for kids. And that worked, oh, that was marvelous"; Joseph stated that "a significant change didn't take place I would say until maybe the latter part of '82. Because Andy was trying to learn but he is kind of slow at learning—like he is at reading"; Joseph added, however, that when a change did take place it was "tremendous"; he stated that defendant was "very remorseful" about his crimes.

William Payton, another "Death Row" inmate, gave testimony that was substantially similar to that of Joseph; he stated that the change that defendant had exhibited "was not a superficial change, it was completely in the inner man. It was inside in his heart"; he added, "And I think the most impressive thing to me was that Andy always tried to apply it, you know. Whatever we were learning [in Bible study]."

In rebuttal, the prosecution called Dr. Flanagan, who stated that he did not agree with the diagnosis of brief reactive psychosis and posttraumatic stress disorder.

Counsel then presented closing argument. When argument was completed, the court stated that it would render its decision the following day.

When that day arrived, the court declared that it was "not prepared to rule on [the] case today" and continued the matter two days.

On the date to which it had continued the proceedings, the court announced its decision and provided a statement of reasons. Because of their importance here, the court's words must be quoted at length.

"THE COURT: All right. The Court is prepared at this time to make a decision and give a statement of reasons. I should indicate this is probably the most difficult decision I have had to make in the 13½ years that I have been a judge. I have agonized over it greatly for three days now, but the following is my statement of reasons and determination:

"In making the determination whether the penalty shall be death or life imprisonment, the Court has taken into account and been guided by the aggravating and mitigating factors shown by the evidence and referred to in Penal Code Section 190.3 as follows:

"Factor A: 'The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1' of the Penal Code.

"As to that factor, the Court notes the defendant has been convicted by a jury or found guilty by a jury of two separate counts of first degree murder personally committed by him, and has found to be true nine special allegations under Section 190.2 of the Penal Code. The special findings were multiple first degree murders. The murder of each of the victims involved the infliction of torture. Each of the murders was committed during the commission and attempted commission of robbery. Each of the murders was committed during the commission and attempted commission of a kidnapping. The murder of Karen Ann Litzau was committed during the attempted commission of rape. The murder of Kimberly Gloe was committed during the commission of rape.

"Factor B: 'The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.'

"Under this factor, the Court finds beyond a reasonable doubt that the defendant was involved in criminal activity which involved the actual use and threat to use force or violence against three separate victims; that is,

Ernest [F.], Kim [P.], Catherine [A.]; and various statements to the police, to the psychiatric experts and to Kim [P.] the defendant made admissions relating to other possible criminal activity, but none of these were proved beyond a reasonable doubt and the Court has not considered them for any purpose.

"Factor C: 'Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.'

"Under this factor, the Court has considered the circumstances of these offenses. The defendant's prior criminal activity involving the use of force or violence, and the testimony of all the expert witnesses that testified at the penalty phase and at the trial. The Court finds that the defendant was not acting under the influence of extreme mental or emotional disturbance in the commission of these crimes. Specifically the Court finds that the defendant was not acting under a post-traumatic stress disorder or under the psychotic state defined as brief reactive psychosis.

"This finding is based on careful evaluation of the conflicting testimony of the expert witnesses, as well as the Court's evaluation of the facts and circumstances surrounding these two crimes and the defendant's criminal history. All the experts agree that the defendant does suffer from an antisocial character disorder and possibly other character disorders.

"His criminal history shows a preoccupation with sexual gratification from either males or females. Ernest [F.] was forced at knifepoint to submit to a homosexual attack which was accompanied by repeated threats of mutilation. He was jabbed in the neck and the groin area and the testicles at knifepoint, causing extreme mental stress, although no actual physical injury. Since he offered no resistance and managed to escape after a relatively short encounter, no one will ever know how much danger he was actually in. Except for the sex of the victim, the circumstances of this crime was very similar to the crimes against Kim [P.] and the original assaults against the two murder victims in this case; that is, the use of a knife, threats of bodily harm or actual infliction of harm, and threats of death.

"Kim [P.] was kidnapped from a parking lot at knifepoint with a knife being held to her throat similar to the fashion that it was held to Mr. [F.'s] throat. She was beaten about the face and the breasts, told that the defendant was going to kill her, that he hated women, that she was physically abused with a Coke bottle until she was bleeding from the vagina. She was burned by lighted cigarettes inserted in her vagina and was called a crybaby when she complained of the pain. Fortunately Kim [P.] also was able to escape when the defendant's attention was distracted by the CB. Defendant

continued cruising around the area for five to ten minutes after her escape shouting threats that he was going to kill her.

"The assault on Catherine [A.] was somewhat different in that a gun was used rather than a knife, and she was ultimately voluntarily released after a four-and-a-half-hour ordeal. The crimes against her were similar to the others in that the defendant repeatedly threatened to kill her because otherwise she would go to the police. He seemed obsessed with her breasts and she was sodomized until she was bleeding.

"The Court notes the similarities in this preoccupation with the breasts, that he had beaten both Kim [P.] and Catherine [A.] in the breast area, that he attempted to cut off the breasts from the body of Karen Litzau and actually cut off both breasts from Kimberly Gloe. Catherine [A.], unlike the others, tried very hard not to aggravate the defendant, repeatedly insisted that she would not report him to the police since she'd voluntarily gotten into his car, and he eventually allowed her to leave the car and he drove away. He apparently changed his mind, however, because shortly afterwards he came back to the area and drove up and down the streets for about 20 minutes while Catherine [A.] hid.

"In the case of the victims in this case, the only reasonable inference from the evidence, as the Court views it, is that he intended to rape them when he first picked them up unless they voluntarily submitted to his demands. He carried the knife to force submission if they should resist. He may have actually preferred to use force because that then gave him an excuse for inflicting pain. When the victims threatened to turn him in to the police, he determined he would kill them to prevent this.

"The strongest indication to the Court that he was not in a brief reactive psychosis at the time is the fact that he tried to cut off Karen Litzau's breasts at the time of the first murder, was unsuccessful in doing so because the knife was dull; and that between that and the second assault he had sharpened the knife and then did actually accomplish this act. This is strong indication to the Court that he might have killed the victims even if they had not threatened to turn him in to the police. It is noted that he had made threats to kill to Kim [P.] and Catherine [A.], as well as threats to maim Mr. [F.].

"There is no evidence introduced either in aggravation or mitigation as to factors D, E or F of Section 190.3. So the Court won't discuss those.

"Factor G: 'Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his

conduct to the requirements of law was impaired as a result of mental disease or—' and I'm adding to this by direction of the Supreme Court—'mental defect or the effects of intoxication.'

"There's no evidence at all of intoxication, and the Court finds the defendant's capacity in that regard was not impaired as a result of mental disease or mental defect.

"The Court has considered the testimony of Dr. Hunt that the defendant suffered from a mental defect of mild mental retardation, and that would be a mental defect, but even if that is a fact, the Court finds that it did not affect the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. The Court has already found he was not acting under brief reactive psychosis or under post-traumatic stress disorder at the time of the murders and will discuss the antisocial character disorder evidence later.

"Factor H: 'The age of the defendant at the time of the crimes.'

"Under the facts of this case, the Court does not consider his age as either a mitigating or aggravating factor. Although most witnesses placed his intellectual development at about a 12-year level, he had fully matured physically, had served a term in the Job Corps and substantial time in the Army, including his two tours of duty in Vietnam. And according to his statements to the doctors, he had been a truck repairman and driver and a helicopter crew chief and a door gunner while in Vietnam. So considering those factors, the Court doesn't feel that age is either a mitigating or aggravating factor.

"As to factor I, there was no evidence introduced relating to this factor, so the Court won't discuss that.

"Factor J: 'Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.'

"The Supreme Court has held in the prior decision in this case that the trier of fact may properly consider sympathy or pity for the defendant in determining whether or not to show mercy and spare the defendant from execution and went on to quote from a federal case in the same case that: 'The defendant is constitutionally entitled to have the sentencing body consider any sympathy factor raised by the evidence before it.'

"As to the jury finding of special circumstances, the Court considers that the primary motivation of the defendant in each of the murders was to

accomplish a sexual assault with infliction of pain and, ultimately, the murders as part of the infliction of pain and, also, to avoid detection. The Court, therefore, does not consider the additional findings regarding kidnapping and robbery to be aggravating factors. I think they were merely incidental to the pain purposes. So the Court does not consider them to be aggravating factors.

"The Court has also considered the testimony of Dr. Gericke, that the testimony [sic] was of low average intelligence, emotionally immature and acting as an adolescent. The Court has considered the testimony by Dr. McEwen that the defendant was diagnosed as having a passive-aggressive personality disorder, that is, a personality dysfunction primarily created out of dependency, coupled with a fear of loss of support and a great deal of anger or rage. Dr. McEwen also stated defendant apparently suffered a great deal of rejection as a child, together with overprotection. He placed defendant's intelligence at the lower end of average.

"Dr. Flanagan diagnosed defendant as suffering from a character disorder, but no mental disease or mental defect. Diagnosis of Dr. Flanagan was mixed character disorder with antisocial features and sexual aggression and inadequate feelings. Dr. Tansey diagnosed defendant as a passive-aggressive personality with antisocial features. Dr. Larkin testified that defendant had borderline to low normal intelligence. He also testified that defendant suffered childhood emotional trauma, slow intellectual development and evidence of antisocial behavior. He diagnosed defendant as having a personality disorder of a mixed type with antisocial aggressive and borderline features with poor impulse control.

"Dr. Ramsaran diagnosed defendant as an antisocial personality with predisposition to act for personal gratification. Dr. Hunt testified that at the time of the murders and, also, the Kim [P.] assault, the defendant did not exhibit the symptoms of specific mental illness, but the doctor did feel that the defendant had some organic problems that were interfering with his mental ability, with his judgment, insight and so on. Dr. Hunt found no psychiatric explanation for the defendant's bizarre behavior. Dr. Hunt testified he did not believe that the defendant should receive the death penalty because he has definite impairment of his mental functions. He has had trouble since he was an infant, that he was not amenable to treatment, that he's not had normal opportunities in life, either from his environment, genetic things or from his ability to think and use good judgment and insight. Dr. Postman also said defendant was below average intelligence, probably mildly retarded, and that he had an antisocial personality disorder.

"The Court has also considered as matters in mitigation the testimony of Deputy Sheriff Roger Coyle about the incident at the county hospital where the defendant interfered to help the deputy avoid harm and, also, his testimony about the defendant's general good conduct while in custody of the county here. *The Court has also considered the testimony of the two death row prison guards and the two death row prisoners concerning defendant's conduct while at San Quentin prison, and, particularly, the changes in his attitude and his actions since his rebirth or newly found interest in the Bible and study of religion. Based on this testimony, the Court is of the opinion that as long as Mr. Robertson is confined to prison, he will not pose any significant danger to the public, including other prisoners or prison officials.*

"The Court has also considered as mitigating factors the historical background information relating to the defendant provided by his mother and sister and the various expert witnesses, including the circumstances that existed at the time of his birth, his not being able to walk until age two and a half, his delay in starting to talk, his being taken to Virginia by his father as a small child, and his return later to California; his chaotic family relationships, his difficulty in school, his relationship with his mother, grandmother and sister, his difficulties with his peers, and his below average intellectual achievement or mild mental retardation.

"By way of summary, the circumstances in aggravation there then include the nature of the crimes themselves:

"First, defendant obviously planned the kidnappings for the purpose of sexual assault and sexual gratification. This is supported by the fact that defendant cruised around looking for potential victims, that he carried the boning knife in violation of his probation, the nature of the assaults on the bodies themselves, the fact that the defendant sharpened the knife between the first and second murders, the extreme mutilation of the bodies before and after death.

"The Court has also considered in aggravation factors relating to the defendant. He apparently obtained gratification from inflicting pain and discomfort, both physical and mental on his victims.

"As evident from the manner in which the murders were committed, it is also evident from the circumstances of his assault on Mr. [F.] when he held the knife to Mr. [F.'s] throat and later on to his groin and to his testicles, when he repeatedly suggested that he ought to mutilate this victim and leave him out on the desert. It is also evident from his conduct with Kim [P.] where he repeatedly threatened to kill her, physically abused her with the Coke bottle until she was bleeding, and by burning her by inserting a

lighted cigarette into her vagina, as well as beating her about the head and breasts. It's also apparent from his conduct with Catherine [A.] where he threatened to kill her, also, and actually physically abused her by sodomizing her until she was bleeding and his bruising of her breasts.

"Catherine [A.] in her testimony said that the defendant was obsessed with breasts and this seemed to be in line with the other victims, because he also beat Kim [P.'s] breasts and attempted to cut off Karen Litzau's breasts, and did, in fact, cut off the breasts of Kimberly Gloe.

"The Court could find no evidence that the defendant was under the influence of any extreme mental or emotional disturbance at the time of the murders or any of the other three assaults.

"The Court finds that at the time of each of the murders the defendant had the capacity to appreciate the criminality of his conduct and conform his conduct to the requirements of law, and that his capacity was not impaired as a result of mental disease or mental defect.

"The Court has also considered the fact that at the time of the murders the defendant was on probation from the crimes committed against Kim [P.] and was actually undergoing therapy at that time.

"The Court has considered circumstances in mitigation: "One, by the testimony of all the doctors, defendant has low average intelligence or is mildly retarded, mentally retarded.

"Second factor is the defendant was emotionally immature.

"The third factor is defendant suffered from personality or character disorders variously described as passive-aggressive personality disorder or mixed character disorder with antisocial features, and sexual aggression or passive-aggressive personality with antisocial features or personality disorder of a mixed type with antisocial, aggressive and borderline features with poor impulse control.

"Four, the defendant may have organic problems that interfered with his mental ability, his judgment and insight.

"Five, sympathy factors which were summarized by Dr. Hunt to include impairment of his mental functions, continual troubles since infancy, the fact that he's not amenable to treatment, that he has not had normal opportunities in life either from his environment or genetic things or from his limited ability to think and to use good judgment.

"And, six, his conduct in coming to the aid of Deputy Sheriff Coyle at some danger to himself.

"*The Court does not consider the fact that he does not appear to pose a threat to society as long as he's confined to prison to be a factor either in aggravation or mitigation in punishment for these offenses.*

"After careful consideration of all the evidence, after considering, taking into account, and being guided by the aggravating and mitigating factors referred to in Penal Code Section 190.3, the Court determines that the penalty should be death." (Italics added.)

After the court announced its decision, defendant requested, and was granted, permission to make a statement. He said: "Your Honor, I know the crime I did was injust [sic] to the two girls, and I look at it with my remorse. If I could take my life right now and bring those two girls back to life, I would do it, but I know that I can't bring them back to life. And what you gave me, I understand, and thank you for hearing my case." The court responded: "Okay, Mr. Robertson." Defendant replied: "Have a good Christmas, sir."

Subsequently, the court denied defendant's automatic application for reduction of penalty pursuant to subdivision (e) of former Penal Code section 190.4 and imposed the sentence of death.

## II.

As I shall explain, the record shows that in determining whether defendant was to live or die the trial court refused, or must be presumed to have refused, to consider evidence he presented to show that he would conduct himself well if sentenced to prison. The record also shows that the court's refusal to take this evidence into account cannot be held harmless.

The principles applicable here are well settled. "[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment, [citation], requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death. [¶] This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific

case." (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 304-305 [49 L.Ed.2d 944, 96 S.Ct. 2978] (opn. of Stewart, Powell and Stevens, JJ.).)

To guarantee that capital sentencing decisions are as individualized and reliable as the Constitution demands, the Eighth Amendment requires that the defendant may not be barred from introducing any relevant mitigating evidence. (*Skipper* v. *South Carolina, supra,* 476 U.S. 1, 4-8 [90 L.Ed.2d 1, 6-9]; see *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 113-115 [71 L.Ed.2d 1, 102 S.Ct. 869]; *Lockett* v. *Ohio* (1978) 438 U.S. 586, 597-605 [57 L.Ed.2d 973, 98 S.Ct. 2954] (plur. opn. by Burger, C. J.).) It also requires, of course, that "the sentencer may not refuse to consider or be precluded from considering 'any [such] relevant mitigating evidence.'" (*Skipper* v. *South Carolina, supra,* at p. 4 [90 L.Ed.2d at p. 6] (quoting *Eddings* v. *Oklahoma, supra,* at p. 114 [71 L.Ed.2d at p. 11]); accord, *Hitchcock* v. *Dugger* (1987) 481 U.S. 393, 394-395 [95 L.Ed.2d 347, 107 S.Ct. 1821, 1822].) In this context, "to consider" means more than merely to hear such evidence (see *Miller* v. *Wainwright* (11th Cir. 1986) 798 F.2d 426, 431): it means to listen to the evidence, assign it weight, and then take it into account in deciding whether the defendant is to live or die (*Eddings* v. *Oklahoma, supra,* at pp. 114-115 [71 L.Ed.2d at p. 11]).

It is plain that the class of "relevant mitigating evidence" (*Eddings* v. *Oklahoma, supra,* 455 U.S. at p. 114 [71 L.Ed.2d at p. 11]) is broad. Included within its bounds is "evidence that the defendant would not pose a danger if spared (but incarcerated) . . . ." (*Skipper* v. *South Carolina, supra,* 476 U.S. at p. 5 [90 L.Ed.2d at p. 7].)

From the foregoing it follows that when the sentencer refuses to consider relevant mitigating evidence there occurs error of federal constitutional dimension—which is commonly referred to as "*Skipper* error." (See *Skipper* v. *South Carolina, supra,* 476 U.S. at p. 4 [90 L.Ed.2d at pp. 6-7]; *Hitchcock* v. *Dugger, supra,* 481 U.S. at pp. 394-399 [95 L.Ed.2d at pp. 350-353].) Indeed, even when the record does not clearly reveal such a refusal on the part of the sentencer but merely furnishes a "legitimate basis for finding ambiguity concerning the factors actually considered," error is presumed to have occurred: "the reasoning of the plurality opinion in *Lockett* compels [the result] . . . so that we do not 'risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.'" (*Eddings* v. *Oklahoma, supra,* 455 U.S. at p. 119 [71 L.Ed.2d at p. 13] (conc. opn. of O'Connor, J.); see *California* v. *Brown* (1987) 479 U.S. 538, 546 [93 L.Ed.2d 934, 107 S.Ct. 837, 842] (conc. opn. of O'Connor, J.).)

As this court recently held in *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1031-1032 [245 Cal.Rptr. 185, 750 P.2d 1342], *Skipper* error is subject to

harmless-error review under the test of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. Under *Chapman,* "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Id.* at p. 24 [17 L.Ed.2d at pp. 10-11].) When the error occurred at the penalty phase of a capital trial, the court must proceed with special caution. (See, e.g., *Satterwhite* v. *Texas* (1988) 486 U.S. 249, 258 [100 L.Ed.2d 284, 295, 108 S.Ct. 1792, 1798] [stating that "the evaluation of the consequences of an error in the sentencing phase of a capital case may be more difficult because of the discretion that is given to the sentencer"].)

As stated above, I believe that *Skipper* error in fact occurred or must be presumed to have occurred. The majority assert that the trial court did indeed take defendant's evidence of future good behavior into account in fixing the penalty. The record, however, is otherwise.

Although it did not state in so many words that it refused to take defendant's evidence of future good behavior into account, the trial court made the point sufficiently plain by implication. It expressly found—and its finding is amply supported by the evidence and not questioned by the majority—that defendant would not be dangerous if imprisoned: "[T]he Court is of the opinion that as long as Mr. Robertson is confined to prison, he will not pose any significant danger to the public, including other prisoners or prison officials." In my view, such a finding entails the conclusion that defendant had established the existence of a factor in mitigation. The reason is plain: since "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered *potentially* mitigating" (*Skipper* v. *South Carolina, supra,* 476 U.S. at p. 5 [90 L.Ed.2d at p. 7], italics added), evidence found persuasive on the point must be considered *actually* mitigating and hence must be given some weight.

But—perhaps influenced by language in *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 772 [175 Cal.Rptr. 738, 631 P.2d 446], to the effect that the issue or future dangerousness "is at best only marginally relevant to" the choice of penalty—the trial court went on to state that the fact it had itself expressly found was immaterial: "the Court does not consider the fact that [defendant] does not appear to pose a threat to society as long as he's confined to prison to be a factor *either in aggravation or mitigation in punishment for these offenses.*" (Italics added.)[1]

---

[1] My reading of the trial court's statement is confirmed when I consider the statement in light of a comment made by the prosecutor in the course of closing argument: "It could also be argued that Mr. Robertson in this category should be given some consideration about mitigation due to the fact that he is able to conform his lifestyle and his way of acting in a controlled environment. This I think would go towards the evidence that in a controlled setting,

It is true that the trial court stated that it had "considered the testimony of the two death row prison guards and the two death row prisoners concerning defendant's conduct while at San Quentin prison, and, particularly, the changes in his attitude and his actions since his rebirth or newly found interest in the Bible and study of religion."

But it is also true that the court stated that in fixing the penalty it did not take such testimony into account: "The Court does not consider the fact that [defendant] does not appear to pose a threat to society as long as he's confined to prison to be a factor either in aggravation or mitigation . . . ."[2]

The majority construe the trial court's statement to mean that the evidence presented on the issue of future conduct—although not insignificant in the abstract—was of minimal weight in the context of this case. But as the record reveals, the evidence is far from insubstantial in either extent or relative importance. Indeed, the defense called six witnesses—Drs. Hunt and Postman, Sergeant Riley and Officer Greene, and "Death Row" inmates Joseph and Payton—to establish that defendant "would not pose a danger if spared (but incarcerated)" (*Skipper* v. *South Carolina, supra,* 476 U.S. at p. 5 [90 L.Ed.2d at p. 7]). In any event, the court made it plain that it did not consider the future conduct evidence at all. In the statement of reasons, it said that in fixing the penalty it had "taken into account and been guided by" certain specified aggravating and mitigating factors. Among those factors there appeared *neither* defendant's evidence concerning future good conduct *nor* its own express finding on the issue.

Faced with the foregoing facts, I am compelled to conclude that *Skipper* error occurred or must be presumed to have occurred. Although it heard the evidence presented by the defense to show future good conduct and went so far as to expressly find that evidence persuasive, in my view the trial court simply did not take the evidence into account in determining whether defendant should be sentenced to death or life imprisonment without possibility of parole. But at the very least, the record furnishes a "legitimate basis for finding ambiguity concerning the factors actually considered" (*Eddings*

such as death row, he is able to conform. I think this is inaccurate in that the crimes that we are talking about in Mr. Robertson's case occurred within his personal life away from the norms or controls that society imposes upon a person."

[2] In passing on defendant's automatic application for reduction of penalty, the trial court confirmed that it had refused to take defendant's evidence of future good behavior into account: "The Court also indicated at th[e] time [it rendered its decision] and the Court did consider in weighing these factors that after consideration of all the evidence it does not appear to the Court that he presently poses a threat to society as long as he's confined to a prison. And considering that I didn't consider that to be either in aggravation or mitigation, punishment, at least, but the Court did make it clear that the Court did not consider that an aggravating factor, the fact that he might still be a danger."

v. *Oklahoma, supra,* 455 U.S. at p. 119 [71 L.Ed.2d at p. 14] (conc. opn. of O'Connor, J.)).

As stated above, I also believe that the *Skipper* error in this case was prejudicial.

The record reveals that the aggravating and mitigating factors were closely balanced. To be sure, the circumstances of the crimes of which defendant was convicted in the present proceeding, together with his prior violent criminal activity, weighed very heavily in favor of death. But defendant's mental retardation, low intelligence, emotional immaturity, and personality and character disorders weighed very heavily in favor of life. The trial court clearly recognized the point when it said: "I should indicate this is probably the most difficult decision I have had to make in the 13½ years that I have been a judge. I have agonized over it greatly for three days now . . . ."[3]

The record also reveals that the evidence presented by the defense to show that defendant "would not pose a danger if spared (but incarcerated)" (*Skipper* v. *South Carolina, supra,* 476 U.S. at p. 5 [90 L.Ed.2d at p. 7]) was far from insignificant. Indeed, under any fair and reasonable standard the testimony on this point presented by Drs. Hunt and Postman, Sergeant Riley and Officer Greene, and "Death Row" inmates Joseph and Payton, must be considered substantial if not compelling.

In view of the foregoing, I simply cannot "declare a belief that [the *Skipper* error] was harmless beyond a reasonable doubt." (*Chapman* v. *California, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at p. 711].) Accordingly, I would vacate the trial court's decision and remand the cause to that court for redetermination of penalty.[4]

## III.

Because *Skipper* error was committed at trial and cannot be deemed

---

[3] The majority assert that the trial court's comment revealed only "a general difficulty in accepting the unfamiliar responsibility, usually borne by a jury, of determining sentence in a capital case." (Maj. opn., *ante,* at p. 57, fn. 14.) The assertion is not supported by the record. First, the court expressly stated in words that the majority have quoted but otherwise chosen to ignore: "I have agonized over it [i.e., the decision] greatly for three days now . . . ." Second, the court's statement of reasons—which the majority have also largely chosen to ignore—graphically reveals just how close the case was.

[4] In passing, I note my agreement with the majority's holding that a capital defendant has a constitutional right to be present at the imposition of sentence. I cannot agree, however, with their conclusion that such a defendant may waive that right.

harmless beyond a reasonable doubt on this record, I am compelled to dissent.

Broussard, J., concurred.

Appellant's petition for a rehearing was denied April 5, 1989, and the opinion was modified to read as printed above. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.